[No. S024599. June 16, 2003.]

THE PEOPLE, Plaintiff and Respondent, v.
MICHAEL LAMONT JONES, Defendant and Appellant.

**COUNSEL**

William Flenniken, Jr., and Kent A. Russell, under appointments by the Supreme Court, for Defendant and Appellant.

Bill Lockyer, Attorney General, David P. Druliner, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Garrett Beaumont, William M. Wood and Holley A. Hoffman, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**KENNARD, J.**—A jury convicted defendant Michael Lamont Jones of the January 21, 1989, murder of Herman Weeks and other crimes. The jury found special circumstances of felony murder, based on burglary and robbery, and returned a verdict of death. This appeal is automatic. (Pen. Code, § 1239.)[1] We affirm the judgment.

## I. PROCEEDINGS BELOW

Defendant was charged with the following counts:

Count I: Participation in a criminal street gang. (§ 186.22.)
Count II: Murder of Herman Weeks (§ 187), with personal use of a handgun (§§ 1192.7, subd. (c)(8), 12022.5). The murder occurred during the commission of a robbery (§ 190.2, subd. (a)(17)(A)), and the commission of a burglary (§ 190.2, subd. (a)(17)(G)).
Count III: Robbery of Weeks (§ 211), with personal use of a handgun (§ 1192.7, subd. (c)(8), 12202.5).

---

[1] Unless otherwise noted, statutory citations are to the Penal Code.

Count IV: Burglary of Domino's Pizza (§ 459), with personal use of a handgun (§§ 1192.7, subd. (c)(8), 12022.5).

Count V: Robbery of Maria Zuniga and Javier Sierra (§ 211), with personal use of a handgun (§§ 1192.7, subd. (c)(8), 12022.5).

Count VI: Attempted murder of Thomas Chegwidden (§§ 187, 664), with personal use of a handgun (§§ 1192.7, subd. (c)(8), 12022.5), and infliction of great bodily injury (§ 12022.7).

Count VII: Attempted robbery of Lola Hall (§§ 211, 664), with personal use of a handgun (§§ 1192.7, subd. (c)(8), 12022.5).

Count VIII: Attempted murder of Lola Hall (§§ 187, 664), with personal use of a handgun (§§ 1192.7, subd. (c)(8), 12022.5).

Count IX: Attempted murder of Maria Zuniga (§§ 187, 664), with personal use of a handgun (§§ 1192.7, subd. (c)(8), 12022.5).

Count X: Attempted robbery of Larry Nave, Brian Wagner, and Christopher Swan (§§ 211, 664) while armed with a handgun (§ 12022, subd. (c)), and with personal use of a shotgun (§§ 1192.7, subd. (c)(8), 12022.5).

Count XI: Attempted murder of Brian Wagner (§§ 187, 664), with personal use of a shotgun (§§ 1192.7, subd. (c)(8), 12022.5) and infliction of great bodily injury (§ 12022.7).

Count XII: Attempted murder of Christopher Swan (§§ 187, 664), with personal use of a shotgun (§§ 1192.7, subd. (c)(8), 12022.5) and infliction of great bodily injury (§ 12022.7).

Count XIII: Attempted murder of Larry Nave (§§ 187, 664), with personal use of a handgun (§§ 1192.7, subd. (c)(8), 12022.5) and infliction of great bodily injury (§ 12022.7).

Counts II through IV relate to a robbery and murder at Domino's Pizza in Riverside on January 21, 1989. Counts V through IX relate to a robbery at the Mad Greek Restaurant in Riverside on December 19, 1988. Finally, counts X through XIII involve an incident in Moreno Valley in Riverside County on October 31, 1989.

Defendant pled guilty to count I (participation in a criminal street gang) and counts X through XII (attempted murders in Moreno Valley). The remaining counts went to trial. On those counts, the jury found defendant guilty as charged, and found that defendant personally used a firearm. It further found as a special circumstance that defendant killed Herman Weeks during the commission of burglary and robbery.

The jury returned a death verdict. The trial judge denied defendant's motions for a new trial and for modification of the verdict, and imposed a sentence of death.

## II. Evidence at the Guilt Phase

### A. The Robbery at the Mad Greek Restaurant

On December 19, 1988, a young Black man dressed in blue came into the Mad Greek Restaurant in Riverside and ordered a soft drink. When he paid at the cash register, the money in the register was visible.

About five minutes later the man returned, accompanied by three other Black men wearing similar blue clothing. Defendant was the only person with a gun. Defendant pointed a revolver at Maria Zuniga, the cashier, and ordered her to open the cash drawer. Zuniga was unable to open the drawer, but Javier Sierra, the cook, opened it. The four men took the cash from the register.

One of the men confronted customers Lola Hall and Thomas Chegwidden. When Hall denied having a purse—she had hidden it under the booth—one of defendant's companions struck Chegwidden. Defendant came over and shot Chegwidden in the chest. The bullet narrowly missed Chegwidden's heart and lodged under his sternum. Defendant then pointed the gun at Hall's head and shot, but missed. As the four men left, defendant fired at Sierra, the cook. Then, saying "this one's for you," he shot at Zuniga. Both of these shots missed. Zuniga later identified defendant in a lineup.

The defense presented no evidence relating to the crimes at the Mad Greek Restaurant and conceded at closing argument that the prosecutor had a "strong case" and "good witnesses" to support the charges against defendant arising from those events.

### B. The Robbery and Murder at Domino's Pizza

On January 21, 1989, defendant was at his home with friends Najee Muslim, Frankie Cruz, Eric Bailey, and Gilbert (last name unknown). Defendant and Bailey were members of the 211 187 Hard Way Gangster Crips, a gang that defendant, Bailey, and another man founded in 1988. The numbers 211 and 187 referred to the Penal Code sections for robbery and murder.

The men decided to go to a party but discovered they did not have the money needed for admission. They then drove around looking for a purse-snatching opportunity. Defendant told Cruz, who was driving, to stop around

the block from a Domino's Pizza restaurant in Riverside. Defendant and another man left the car.[2]

Christina Kane, the assistant manager at Domino's Pizza, saw two men enter the restaurant. The first man, whom she later identified as defendant, was carrying a revolver. The other was not armed. Defendant walked around the counter and pointed the gun at Herman Weeks, the manager, and told him to "open it up." Defendant took the money from the cash drawer. As defendant was walking out, he shot twice at Weeks, hitting him once. Defendant aimed at Kane, who ducked and ran behind the oven. Weeks died from the gunshot wound.

On cross-examination, Kane admitted that in a lineup she identified a person not connected to the case as the shooter, and that she told the police she was 99 percent certain of that identification. At defendant's preliminary hearing, Kane identified defendant as the shooter, but she tentatively identified Alan Murfitt, a gang member not present at the Domino's Pizza robbery, as the second robber.

Victor Moreno, a customer at Domino's Pizza, also testified that he saw two men enter, and that he saw the man with the gun order the manager to open the register. He confirmed that only one of the robbers had a gun. He was not asked to identify defendant.

Najee Muslim said he waited in the car while defendant and Eric Bailey went into Domino's Pizza. When they returned, Muslim saw that defendant was carrying a revolver. Cruz opened the door and vomited because he "knew what had happened." As they drove to the party, defendant said he had "robbed the place" and "had to let him have it." He asked if Bailey had heard "the guy at the register" "make that noise" and said that he had to shoot the man a second time to "shut him up." On cross-examination, Muslim acknowledged that in return for his testimony the prosecution had agreed to allow him to plead guilty to a misdemeanor of accessory after the fact to an unrelated robbery. The prosecution then called Detective Guy Portillo, who said that Muslim had given him a similar account of the Domino's Pizza incident before charges were filed against Muslim.

Enrique Luna, a gang member who was not involved in the Domino's Pizza robbery, testified that he heard about the murder at Domino's Pizza and asked defendant about it. Luna said that defendant said he had killed a

---

[2]The prosecution, relying on the testimony of Najee Muslim, claimed the man who went into Domino's Pizza with defendant was Eric Bailey. The defense claimed the second robber was Andre Davis, but offered no evidence to support this claim.

person at Domino's Pizza and that defendant "had no problem" admitting the murder. Later, defendant told Luna that he had sold the gun because "it had a murder on it." When the defense presented evidence that Luna had been allowed to plead guilty to an unrelated robbery and had received five years' probation, the prosecution called Detective Mark Boyer to testify that Luna had told him of defendant's involvement in the murder before Luna had been charged with a crime.

Erin Burton and Tara Taylor gave photographs of defendant and Bailey to a Domino's Pizza private investigator. Defendant threatened to kill Taylor if he learned that she had given the photographs to the investigator.

Burton testified that in May 1989 she encountered defendant and asked, "Mike, about the Domino's thing, did you do it?" He replied, "Yeah." She asked, "How could you do it? How could you kill someone? Don't you feel any remorse?" He responded, "Nah. It was a good party."

The parties stipulated that when Burton was shown photographs of defendant and Michael Eugene Jones, and was asked to select the Michael Jones she knew, she selected the photograph of Michael Eugene Jones, not defendant.

Frankie Cruz testified at the preliminary hearing that he drove the car the night of the Domino's Pizza robbery. He heard shots and vomited "because I knew what happened." Cruz also said that sometime after the robbery defendant told him, "I killed that guy [and] got about $15, $20." Cruz committed suicide before defendant's trial; his preliminary hearing testimony was read to the jury. The jury was not informed of the suicide, but only that Cruz was unavailable.

Carlos Hunt testified that in November 1989 he was in a jail cell with defendant and other members of the Crips gang. According to Hunt, Alan Murfitt brought up the subject of the Domino's Pizza robbery and said that defendant did it. Defendant said he only got about $25. When Hunt asked defendant why he killed the person, defendant replied, "I don't know. I just did it." Hunt went to the police and offered to tell them about the conversation if they would take care of all six of Hunt's misdemeanor traffic violations. Later all six cases were dismissed.

The defense presented two witnesses. Richard Cleary, a deputy public defender, described how lineups were conducted; in his view, the conditions did not hamper accurate identifications. Najee Muslim, re-called by the defense after previously testifying for the prosecution, said that on the night

of the Domino's Pizza murder defendant had short hair and was wearing a blue jacket with stripes and squares. In the descriptions given by eyewitnesses Kane and Moreno, neither mentioned the stripes and squares on the jacket.

## III. Evidence at the Penalty Phase

### A. *The Moreno Flats Incident*

Five witnesses described the events at a party in an area called "the flats" in Moreno Valley in Riverside County on October 31, 1989, Halloween night. While the witnesses and others were present, five Black men, including defendant, arrived. After a short while, Mario Villarreal, one of defendant's companions, pulled out a gun and demanded money. Defendant took out a shotgun, asked who had the money, and fired a shot before anyone answered. Defendant pointed the gun at Brian Wagner and shot him in the stomach. Defendant said, "There's one. Who's got the money?"

Defendant then shot Christopher Swan and said, "There's two of your friends. Where's the money?" As Larry Nave was running away, Villarreal shot him. Nave, Wagner and Swan were injured, the latter two seriously, but all survived.

Luis Villarreal testified that his brother Mario, defendant, and others returned to the Villarreal residence that night. Defendant said something like "Boom, one went down. Then, boom, another went down."

Defendant pled guilty to all charges arising from the Moreno Flats incident.

### B. *Defense Evidence at the Penalty Phase*

Cyndy Pitts, defendant's mother, testified that his father, Willie Jones, often abused her physically, and once tried to push defendant out of a second story window.

Willie Jones admitted abusing his wife and son, and said he had a problem with drugs and alcohol. He was imprisoned for armed robbery in 1982 or 1983. When he got out of prison he moved to New York and severed all ties with his family.

Nathan Jones, defendant's brother, said defendant took care of him when his father was absent and his mother was working.

Beatrice Acosta, defendant's girlfriend, testified that after their baby was born she lived with defendant and his mother in Moreno Valley for three months. She said defendant was a helpful father but got drunk every day.

Sheila Barcus, defendant's aunt, and Minnie Nixon, defendant's grandmother, both testified that the person who committed the charged crimes was completely different from the Michael Jones they knew as a child. Glenn Garbot, defendant's uncle, said he could not believe defendant could be involved in the crimes. Joseph Gueste, defendant's pastor, also said that the person who committed the crimes seemed like a different person.

Dr. Steven Buckey, a clinical psychologist, specializes in problems of the alcoholic family. He testified that children who are raised in an alcoholic family have difficulty identifying and expressing feelings, and do not think clearly about the consequences of their behavior. In Dr. Buckey's opinion, defendant was an alcoholic by the age of 13. On cross-examination by the prosecution, Dr. Buckey acknowledged that defendant showed symptoms of antisocial personality disorder.

## IV. MOTIONS FOR NEW TRIAL AND TO MODIFY THE VERDICT

When the jury returned its verdict of death, defendant said to the judge: "Your Honor, I didn't kill him. I did not kill him. I didn't kill him. Andre killed him. I didn't even kill him."

In its motion for a new trial, the defense argued that Andre Davis, Najee Muslim's cousin, more closely resembled the composite sketch of the second robber than did Eric Bailey and that consequently the prosecution dismissed the charges against Bailey. Defendant asserted that Bailey's counsel had located Davis, who was confined in the Sierra Conservation Center at Jamestown, and had arranged for Davis to be present if Bailey went to trial, but that defendant's own counsel failed to use the same information and did not know where Davis was. The court ruled that defendant's counsel had failed to use due diligence to locate Davis, but denied the motion for a new trial on the ground that the question whether Bailey or Davis was the second robber did not affect defendant's guilt.

The trial court also denied the defense request for modification of the verdict.

## V. JURY SELECTION

 Defendant contends that he was denied his right to a fair and impartial jury and to a reliable guilt and penalty determination, in violation

of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and analogous state constitutional provisions, because the prosecutor exercised peremptory challenges to remove two Black prospective jurors on grounds of group bias. (See *Batson v. Kentucky* (1986) 476 U.S. 79, 89 [106 S.Ct. 1712, 1719, 90 L.Ed.2d 69]; *People v. Wheeler* (1978) 22 Cal.3d 258, 276, 277 [148 Cal.Rptr. 890, 583 P.2d 748].) ██ "A party who suspects improper use of peremptory challenges must raise a timely objection and make a prima facie showing that one or more jurors has been excluded on the basis of group or racial identity. . . . Once a prima facie showing has been made, the prosecutor then must carry the burden of showing that he or she had genuine nondiscriminatory reasons for the challenges at issue." (*People v. Jenkins* (2000) 22 Cal.4th 900, 993 [95 Cal.Rptr.2d 377, 997 P.2d 1044].)

██ Defendant timely objected to the prosecution challenges for Prospective Jurors Robbie T. and Leo W. In both instances the trial court ruled that defendant had failed to make a prima facie showing that the challenge was based on group bias. The jury as selected contained no Blacks. Before trial, however, one of the jurors was discharged, and replaced by a Black woman who had been the first alternate juror.

### A. *Robbie T.*

We note the following excerpts from the voir dire of Robbie T.

Juror: "Right now, I could not honestly say yes to the death penalty."

Peasley (Defense Counsel): "Can you consider cases where you would give the death penalty?"

Juror: "I'm really not sure."

Peasley: "Just as long as you could be open to both [death or life without parole], that's all it requires. Do you think you could do that?"

Juror: "[If] I had to answer yes or no right now without any certainty, I couldn't do that."

Peasley: "[W]ould you be willing to consider both options?"

Juror: "I could do that."

Pacheco (Prosecutor): "[Suppose] the judge says, hey, if you vote for the death penalty . . . he's going to be executed the very next day. No appeals, no nothing. . . . Will that prevent you from voting for the death penalty?"

Juror: "It might. . . . To be honest, yes."

The trial judge gave a detailed explanation of the law, explaining the weighing process involved in the penalty decision. He then asked Robbie T. if she would set aside personal feelings, follow the instructions, and make a decision by weighing the facts; she replied that she would. Later the prosecutor remarked that he had planned to challenge Robbie T. for cause but the court had rehabilitated her.

Even though Robbie T. was rehabilitated, her earlier answers could have given the prosecutor ample reason to believe that she would not be a favorable penalty phase juror. Defendant, however, argues here that the prosecution's "outrageous" question asking Robbie T. how she would respond if she learned a defendant would be executed the day after the verdict shows that the prosecution was not acting in good faith, and had a secret purpose to remove all Black jurors. We can agree with the defense that the refusal of a juror to vote for death if that sentence would be carried out without appeal—a patently illegal procedure—would not offer a prosecutor any grounds for concluding that the juror was inclined against the death penalty. But this interchange between Robbie T. and the prosecutor does not stand alone, and on the whole record the prosecutor could reasonably have concluded that she would be an unfavorable penalty phase juror. The trial court did not err in finding that defendant had failed to make out a prima facie case that Robbie T. was challenged because of her race.

### B. *Leo W.*

█ The prosecutor asked a group of jurors that included Leo W., "Let's assume for a moment that it was an accidental killing. He dropped the gun. It ricocheted, the bullet ricocheted and killed the person. . . . Do you think you'd be unable to give him the death penalty because he didn't intend to kill?" Leo W. responded, "I think I would go with life, especially if it was an accident."

Later the prosecutor asked Leo W. why he left his job at the California Rehabilitation Center. Leo W. responded: "I'm not a law enforcement type of person. I'm not a real authoritative type of person by nature. . . . I'm not a law enforcement person, so I chose not to do it. It didn't sit well with me." He added: "You just asked earlier if it was difficult for them [the jurors] to come to a conclusion. If all the evidence—if it was proven that the person is guilty, it would be difficult for me to make a decision. I have to be honest with you. It would be difficult." The prosecutor could reasonably have concluded from these remarks that Leo W. would not be a favorable penalty phase juror.

Defendant argues that the prosecutor's question about imposition of the death penalty in a case of an accidental killing was improper, since the case here did not involve an accidental killing. The defense implies that the prosecutor asked the question to develop a ground for challenging Leo W., and to cover up the real basis for his peremptory challenge, Leo W.'s race. (See *Miller-El v. Cockrell* (2003) 537 U.S. 322 [123 S.Ct. 1029, 154 L.Ed.2d 931] [disparate questioning of Black venire members to develop grounds for peremptory challenges may show discriminatory intent].) But the prosecutor did not single out Leo W. or other Black prospective jurors to question them about the death penalty in a case of accidental killing. He posed his question to a group of six prospective jurors, including Leo W. and five White jurors. The prosecutor had earlier put similar questions about the felony-murder rule and unintentional or accidental killings to other groups of jurors. The record thus indicates that the prosecutor was trying to explain the felony-murder rule and ferret out any jurors hostile to that rule, not to develop grounds for challenging Leo W.

Defendant finally argues that his counsel should have objected when the prosecutor told the group of jurors including Leo W. that he, the prosecutor, had asked almost every juror whether that juror could vote for death in the case of an accidental killing, when in fact he had asked that question on four previous occasions to 17 jurors, but not to all or most of the jurors.

■ "We have repeatedly emphasized that a claim of ineffective assistance is more appropriately decided in a habeas corpus proceeding." (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266-267 [62 Cal.Rptr.2d 437, 933 P.2d 1134]; *People v. Wilson* (1992) 3 Cal.4th 926, 936 [13 Cal.Rptr.2d 259, 838 P.2d 1212]; *People v. Pope* (1979) 23 Cal.3d 412, 426 [152 Cal.Rptr. 732, 590 P.2d 859, 2 A.L.R.4th 1].) The defendant must show that counsel's action or inaction was not a reasonable tactical choice, and in most cases " ' " 'the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged . . . .' " ' (*People v. Mendoza Tello, supra,* at p. 266; *People v. Wilson, supra,* at p. 936; *People v. Pope, supra,* at p. 426.)" (*People v. Michaels* (2002) 28 Cal.4th 486, 526 [122 Cal.Rptr.2d 285, 49 P.3d 1032].) The record does not show whether counsel had a tactical reason for failing to object to the prosecutor's comment.

## VI. GUILT

Defendant offered no defense to the charges stemming from the robbery at the Mad Greek Restaurant, and at the guilt phase closing argument, defense counsel did not contest those charges. Defendant maintains, however, that a number of guilt phase errors individually and collectively denied him the

right to present the defense that he was not the actual killer in the Domino's Pizza robbery and thus denied him his right to due process of law and a reliable guilt and penalty determination, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and analogous state constitutional provisions. He further alleges that the failure of his counsel to protect him from such errors denied him the right to effective assistance of counsel, in violation of the Sixth and Fourteenth Amendments and corresponding state provisions. We address each claim of error individually, then consider the cumulative effect.

## A. Admissibility of Muslim's October 27, 1989, Statement to the Police

██ After the defense presented evidence of Muslim's favorable plea bargain, the prosecution sought to rehabilitate him by presenting evidence of a prior consistent statement that he gave to police officers on October 27, 1989, before he had been charged with a crime. The defense objected, citing Evidence Code section 791, subdivision (b), which allows admission of prior consistent statements only when "the statement was made before the bias, motive for fabrication, or other improper motive is alleged to have arisen." Defendant argues that Muslim feared prosecution for the murder of Herman Weeks at Domino's Pizza, and thus had a motive to put the blame on petitioner as soon as the police contacted him about that murder. The Attorney General replies that Muslim's statement was made before the plea bargain and hence before one of the circumstances providing a motive for him to accuse defendant had arisen.

The issue thus posed is whether a prior consistent statement is admissible if made before one of the alleged grounds for bias existed, but after another such ground. We discussed this matter in three previous cases.

In *People v. Andrews* (1989) 49 Cal.3d 200, 210 [260 Cal.Rptr. 583, 776 P.2d 285], we upheld the admission of a prior consistent statement, saying that "defense counsel's questioning of [the accomplice] raised an implicit charge that the 'deal' provided [him] with an additional motive to testify untruthfully. This, in turn, entitled the prosecution to show that [the accomplice's] testimony was consistent with the recorded statement he gave shortly after his arrest but before the 'deal' was consummated, that is, before the subsequent, specific motive to fabricate arose." *People v. Hayes* (1990) 52 Cal.3d 577, 609 [276 Cal.Rptr. 874, 802 P.2d 376], described our holding in *Andrews*: "We [there] rejected the defendant's contention that admission of the statement was error because the witness had a motive to fabricate when he made the prior statement. We decided, in effect, that a prior consistent statement is admissible if it was made before the existence of *any*

*one or more* of the biases or motives that, according to the opposing party's express or implied charge, may have influenced the witness's testimony." (Italics added.) *People v. Noguera* (1992) 4 Cal.4th 599 [15 Cal.Rptr.2d 400, 842 P.2d 1160] reached the same result. It said: "Although defendant argues that [the accomplice] had a motive to minimize his potential penal liability as soon as [the police] told him that he was liable criminally as a coconspirator, as *People v. Hayes, supra,* 52 Cal.3d 577, makes clear, the focus under Evidence Code section 791 is the specific agreement or other inducement suggested by cross-examination as supporting the witness's improper motive." (*Hayes,* at p. 630.)

On the basis of these three decisions, we conclude that the trial court here properly admitted the consistent statement of Najee Muslim because it was made before the plea bargain was struck and thus before the existence of one of the grounds alleged in defendant's charge that Muslim's trial testimony was biased.

Defendant accuses his counsel of incompetence for not requesting a jury instruction that, before the jury could consider the prior consistent statements of Muslim and Luna, it had to first find that neither Muslim nor Luna had been threatened with prosecution for murder before the police interviewed them. As we have explained, the evidence was admissible because the statements at issue were made before the plea bargains with Muslim and Luna were agreed upon. In deciding what weight to give that evidence, the jury could consider the possibility that even before the plea bargains, Muslim and Luna were under pressure to make statements exonerating themselves and naming defendant as the killer. But the jurors were not required to find the total absence of any motive for bias before they could give any weight to the testimony.

B. *Admissibility of the August 1989 Statement of Enrique Luna*

As with Najee Muslim, the defense presented evidence that Enrique Luna had received a favorable plea bargain. The prosecutor then introduced evidence of a prior consistent statement Luna made to the police before Luna was arrested and charged in this case. Defendant now argues that the trial court erred in admitting the prior statement because Luna had a motive to fabricate in order to minimize his role in the Domino's Pizza robbery once the police had contacted him.

This issue is identical to the issue concerning Najee Muslim's prior consistent statement described in the previous section. For the reasons there stated, we uphold the admission of Luna's prior consistent statement.

C. *Sustaining an Objection to a Question to Najee Muslim*

Muslim's October 27, 1989, statement to the police implicated defendant as the actual killer. Defense counsel sought to prove that Muslim had been threatened with prosecution before making that statement, and thus had a motive to exaggerate defendant's role in the Domino's Pizza killing, both because that would implicitly minimize Muslim's role and because cooperating with the police might gain Muslim the benefit of a favorable plea agreement.

Muslim acknowledged that before he talked to the police, they told him that they knew of his involvement with the robbery and said, "either you go down with them [the other robbers] and get charged with murder or you can come down and talk with us." Defense counsel then asked Muslim whether the police had accused him of being the shooter. The prosecutor objected that the question had been "asked and answered," and the trial court sustained the objection.

In view of defendant's lengthy cross-examination of Muslim, it is understandable that the prosecutor and judge may have thought Muslim had already been asked about accusations that he was the shooter. But a review of the record shows the question had not been asked. ■ The accusation of murder is not the same as an accusation of being the shooter; the latter is more serious, because in a felony-murder setting the actual killer is more likely to receive a death sentence.

Thus the trial court erred in sustaining the objection on the ground that the question had been asked and answered. Defendant does not claim that this error standing alone is prejudicial; we consider cumulative prejudice in part VI.L., *post.*

D. *Admissibility of Testimony That Muslim Received a Favorable Plea Bargain in Return for Testifying Against Defendant*

■ Muslim testified that he pled guilty to an unrelated armed robbery and was to be placed on five years' probation. The defense proposed to call a public defender who would testify that probation for armed robbery was rare. The prosecution objected that admission of the testimony would require undue consumption of time and divert the jurors from the case before them. (See Evid. Code, § 352.) The trial judge sustained the objection, saying that in his personal experience a grant of probation for an armed robbery conviction was not rare or unusual.

The trial court acted within its discretion in so ruling. (See *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124 [36 Cal.Rptr.2d 235, 885 P.2d 1].)

Whether probation for armed robbery is unusual is not particularly proba-
tive. As the prosecutor pointed out, the probative issue was whether proba-
tion would be unlikely in a case such as Muslim's, but proof of that fact
would have required evidence of the details of an otherwise unrelated crime,
as well as evidence of Muslim's criminal record. The trial court could
reasonably have concluded that permitting such evidence would confuse the
issues and result in an undue consumption of time.

Defendant argues that his counsel should have presented evidence that
Muslim's partner in the robbery was sentenced to three years in prison. We
do not need to reach that question because there is no evidence in the record
disclosing the sentence of Muslim's crime partner, so the issue cannot be
raised on appeal.

E. *Prosecution Misconduct in Failing to Reveal a Plea Agreement with
Frankie Cruz*

█ Because Frankie Cruz committed suicide before defendant's trial, the
prosecution used his preliminary hearing testimony. Defendant claims that
the prosecution improperly failed to reveal before the trial that it had entered
into a plea bargain with Cruz before the preliminary hearing, thereby
preventing defense counsel from cross-examining Cruz concerning that bar-
gain. Defendant claims that the failure to disclose the plea bargain denied
him due process of law under *Brady v. Maryland* (1963) 373 U.S. 83, 87 [83
S.Ct. 1194, 1196-1197, 10 L.Ed.2d 215], which held that the suppression of
evidence favorable to the accused violates due process when the evidence is
material as to guilt or punishment. He also argues that his counsel was
ineffective because he did not object to the admission of Cruz's preliminary
hearing testimony on the ground that the prosecution had concealed its plea
bargain with Cruz.

There is, however, no evidence in the appellate record that the prosecution
made a plea bargain with Cruz. Defendant argues that it is reasonable to
suppose such a bargain was made, because (a) Cruz would probably not have
testified favorably to the prosecution without getting some benefit in return,
and (b) the prosecution made a plea bargain with Najee Muslim before the
preliminary hearing, but did not reveal it until after the hearing. But a
reasonable surmise does not substitute for record evidence. The record on
appeal is insufficient to support defendant's claim.

Defendant argues that the prosecutor committed misconduct when he told
the jury in his closing argument that there was "no evidence" of a plea
bargain with Cruz. In fact, there was no evidence before the jury of any such

bargain. We do not decide defendant's claim that the prosecutor's comment should nevertheless be considered misconduct because the prosecutor knew there had been such a bargain even though it was not in evidence; that issue depends upon proof in a habeas corpus proceeding that such a bargain existed.

F. *Refusal to Reopen the Testimony to Permit the Defense to Introduce Photographs of Eric Bailey and Alan Murfitt*

 At the preliminary hearing, Christina Kane identified a photograph of Alan Murfitt as the man who robbed Domino's Pizza with defendant. At trial, however, the prosecution claimed Eric Bailey was the second man. The defense offered photographs of Murfitt and Bailey for identification, and at the close of its case offered them into evidence. The prosecution objected for lack of foundation because no witness had examined the photographs and identified the persons pictured.

Defense counsel, realizing that he had failed to lay the foundation for the introduction of the photographs, moved to reopen his case and recall Najee Muslim, who could identify the photographs.

The prosecution had already placed in evidence other photographs of Bailey, but there was no photograph of Murfitt in evidence. The trial court, however, noted that Murfitt had been in the courtroom, so the defense could have requested the court to take judicial notice of his presence and have the jury observe him. Defense counsel replied that he thought it was simpler to put the photographs into evidence. The court said the photographs were of very little relevance, although they might help defendant in arguing misidentification, and denied the motion to reopen.

Defense counsel explained his inadvertent failure to lay a foundation, and then moved for a mistrial based on ineffective assistance of counsel. The court denied that motion also.

 In determining whether a trial court has abused its discretion in denying a defense request to reopen, the reviewing court considers the following factors: "(1) the stage the proceedings had reached when the motion was made; (2) the defendant's diligence (or lack thereof) in presenting the new evidence; (3) the prospect that the jury would accord the new evidence undue emphasis; and (4) the significance of the evidence." (*People v. Funes* (1994) 23 Cal.App.4th 1506, 1520 [28 Cal.Rptr.2d 758].)

 The Attorney General concedes the first two factors: the motion was made shortly after the closing of evidence, and the failure to lay a

foundation for the admission of the photographs was inadvertent. Contrary to the Attorney General's claim, there is no reason to believe that the jury would have given undue weight to the photographs because they were introduced after testimony was reopened. Finally, the evidence was significant because Kane's misidentification of Murfitt as the second robber at Domino's Pizza, coupled with the difference in appearance between Murfitt and Bailey (who according to the prosecution was the second robber), would support defendant's claim that Kane could not differentiate between persons of another race. Without the photograph, the jury would not know whether the two men were so similar in appearance that one could easily mistake Murfitt for Bailey. There would be no undue consumption of time: the simple introduction of a photograph would take little time, and the defense did not propose to introduce any further evidence concerning Murfitt's involvement or lack of involvement in the robbery and murder.

We conclude that the court abused its discretion in refusing to reopen the case to permit the defense to lay a foundation for the identification of Alan Murfitt. We will consider the prejudicial effect, if any, of this conclusion when we later examine cumulative prejudice.

G. *Admissibility of Expert Evidence on Eyewitness Identification*

 Defendant sought to call Dr. Kathy Pezdek to testify as an expert on scientific research that refuted many commonly held assumptions about eyewitness testimony. The prosecutor told the trial court that eyewitness identification was not a key element of his case; instead, he was relying primarily on defendant's admissions. Relying on this representation, the court denied defendant's request, reasoning that the expert testimony would not assist the jury. Defendant renewed his request at the close of the prosecution's case, but the court again denied the motion.

 In *People v. McDonald* (1984) 37 Cal.3d 351 [208 Cal.Rptr. 236, 690 P.2d 709, 46 A.L.R.4th 1011] (*McDonald*), the leading California case allowing the introduction of expert testimony on eyewitness identification, this court said: "[T]he decision to admit or exclude expert testimony on psychological factors affecting eyewitness identification remains primarily a matter within the trial court's discretion; . . . 'we do not intend to "open the gates" to a flood of expert evidence on the subject.' [Citation.] We expect that such evidence will not often be needed, and in the usual case the appellate court will continue to defer to the trial court's discretion in this matter. Yet deference is not abdication. When an eyewitness identification of the defendant is a key element of the prosecution's case but is not substantially corroborated by evidence giving it independent reliability . . . , it will ordinarily be error to exclude that testimony." (*Id.* at p. 377, fn. omitted.)

The Attorney General cites *People v. Sanders* (1995) 11 Cal.4th 475 [46 Cal.Rptr.2d 751, 905 P.2d 420], which distinguished *McDonald.* *Sanders* said: "Although eyewitness testimony was a key element of the prosecution's case, here, unlike *McDonald,* eyewitness testimony was not the *only* evidence linking the defendant to the crime. The eyewitness identification was corroborated by other independent evidence of the crime and the conspiracy leading to it." (*People v. Sanders, supra,* 11 Cal.4th at p. 509, italics in original.) But this language from *Sanders* cannot be viewed as limiting the holding of *McDonald, supra,* 37 Cal.3d at page 376, to cases in which, apart from the eyewitness identification, there is *no* other evidence whatever linking defendant to the crime: Exclusion of the expert testimony is justified only if there is other evidence that substantially corroborates the eyewitness identification and gives it independent reliability.

The corroborating evidence here meets *McDonald*'s standard. Kane's identification of defendant was corroborated by testimony of Muslim, Cruz, Luna, Hunt, and Burton. It does not matter, for this purpose, that Muslim, Cruz, and Luna may have been accomplices whose testimony would require corroboration to support a conviction. (§ 1111.) Neither does it matter that all five witnesses could be impeached by proof of bias or prior inconsistent statements. The cumulative corroborative effect of the testimony of defendant's admissions is sufficient to give independent reliability to the eyewitness identification.

## H. *Jury Instructions on Late-joining Accomplices*

The trial court submitted to the jury the question whether Najee Muslim and Frankie Cruz were accomplices. Defendant argues that the court should have instructed the jury on the possibility that, if Muslim and Cruz were not accomplices from the beginning, they became accomplices after the robbers returned from Domino's Pizza with the proceeds of the robbery.

An "accomplice" is defined as "one who is liable to prosecution for the identical offense charged against the defendant." (§ 1111.) The issue whether Muslim and Cruz could be late-joining accomplices under this definition is more complex than either defendant or the Attorney General recognizes. Even if not an accomplice from the beginning of the enterprise, Cruz became an accomplice to the *robbery* when the robbers returned with their loot and he drove the getaway car, because the crime of robbery continues until the perpetrators have reached a place of safety. (See *People v. Cooper* (1991) 53 Cal.3d 1158, 1164-1165 [282 Cal.Rptr. 450, 811 P.2d 742].) Muslim, a passenger, was not necessarily an accomplice to the robbery, but might have become one if, by his conduct, he showed that he

was participating in the asportation of the robbery proceeds. On the other hand, neither Muslim nor Cruz could be accomplices to the *murder* if they did not aid and abet the robbery until after the murder occurred. (See *People v. Pulido* (1997) 15 Cal.4th 713, 716 [63 Cal.Rptr.2d 625, 936 P.2d 1235].)

Although defendant could have submitted an instruction explaining the circumstances under which Muslim and Cruz might have been accomplices to the robbery but not to the murder, there is no authority for the defense claim that the trial court must so instruct on its own motion. There is also no reason to believe that the jury was misled, or defendant prejudiced, by the absence of such an instruction. The only purpose of instructions on whether Muslim or Cruz could be late-joining accomplices would be to assist the jury in deciding whether to view their testimony with caution. (See *People v. Terry* (1970) 2 Cal.3d 362, 398-399 [85 Cal.Rptr. 409, 466 P.2d 961].) In view of the entire circumstances of the case—the presence of both Muslim and Cruz in the car used to transport defendant to Domino's Pizza, their willing attendance at a party after the robbery and murder, Muslim's plea bargain, and Cruz's nonappearance at trial—we have no doubt that the jurors viewed their testimony with extreme caution.

I. *Jury Instructions on Failure to Prosecute a Coparticipant*

Defendant contends that the trial court erred in giving an instruction based on CALJIC No. 2.11.5: "There has been evidence in this case indicating that a person other than the defendant was or may have been involved in the crime for which defendant is on trial. [¶] There may be many reasons why such person other than the defendant is not here on trial. Therefore, do not discuss or give any consideration as to why the other person is not being prosecuted in this trial or whether he has been or will be prosecuted. Your duty is to decide whether the People have proved the guilt of the defendant on trial."

As defendant correctly observes, we have often said that trial courts should not give CALJIC No. 2.11.5 in an unmodified form when, as here, a person who might have been prosecuted for the crime has testified at trial. (*People v. Lawley* (2002) 27 Cal.4th 102, 162 [115 Cal.Rptr.2d 614, 38 P.3d 461]; *People v. Williams* (1997) 16 Cal.4th 153, 226 [66 Cal.Rptr.2d 123, 940 P.2d 710].) The impact of this mistaken instruction, however, was ameliorated because the court gave proper instructions that in assessing the credibility of witnesses the jury could consider "[t]he existence or nonexistence of a bias, interest, or other motive" and "[t]he witness' prior conviction of a felony." (CALJIC No. 2.20.) The jury was again instructed: "The fact that a witness has been convicted of a felony . . . may be considered . . .

only for the purpose of determining the credibility of the witness." (CALJIC No. 2.23.) Finally, the jury was told that the testimony of an accomplice should be viewed with mistrust. (CALJIC No. 3.18.) Relying on these instructions, defense counsel argued that the jury should not credit the testimony of Muslim and Luna because it was given to obtain favorable plea bargains. The prosecutor raised no objection. We have declined to label a mistake in the giving of CALJIC No. 2.11.5 as error when, as here, "the instruction is given with the full panoply of witness credibility and accomplice instructions." (*People v. Lawley, supra,* 27 Cal.4th at p. 162.)

### J. · Jury Instructions on Consideration of Penalty

Defendant also objects to CALJIC Nos. 8.83.2 and 17.42. The former instructs the jury: "In your deliberations the subject of penalty or punishment is not to be discussed or considered by you." The latter similarly instructs: "In your deliberations do not discuss or consider the subject of penalty or punishment. That subject must not in any way affect your verdict."[3] Both of these instructions were requested by the defense.

This issue is similar to the preceding issue. It is clear that the jury can consider the difference between the potential penalties faced and the actual penalties received by accomplices in assessing their credibility. In light of the instructions given and arguments presented, a reasonable juror would recognize that instructions barring discussion of punishment—which serve the obvious purpose of preventing discussion of a *defendant's* punishment at the guilt phase of the trial (see, e.g., *People v. Carrera* (1989) 49 Cal.3d 291, 319 [261 Cal.Rptr. 348, 777 P.2d 121])—do not prohibit a juror from considering the punishment the accomplices faced and what they actually received in assessing the credibility of their testimony. (See *People v. Price* (1991) 1 Cal.4th 324, 446 [3 Cal.Rptr.2d 106, 821 P.2d 610].)

### K. Admissibility of Evidence of Gang Membership

Defendant moved in limine to exclude all evidence of gang membership.[4] After a hearing, the trial court ruled that the prosecution could produce evidence that defendant "belonged to a gang, that the gang was formed in 1988, that the gang's name was 211 187 Hard Way Gangster Crips . . . ." The prosecution did so. Defendant argues that the admission of this evidence unconstitutionally denied him due process of law, a fair trial, and a reliable guilt and penalty determination.

---

[3] CALJIC Use Notes indicate that No. 8.83.2 should be used instead of No. 17.42 when a special circumstance is charged. (Use Note to CALJIC No. 8.83.2 (5th ed. 1988), p. 406.)

[4] Defendant had pled guilty to the charge of gang participation, thus removing that issue from the trial.

The prosecution argued gang membership was essential to show the relationship between the individuals involved in the Mad Greek Restaurant and Domino's Pizza robberies, and in particular the relationship between defendant and Eric Bailey, who according to the prosecution was the second Domino's Pizza robber. The prosecution presented a photograph of defendant and Bailey that the two had captioned "tag-team robbers." The trial judge observed that the name of the gang, with its reference to sections 187 (murder) and 211 (robbery), was relevant to show that when committing a robbery, the gang members planned in advance to kill victims and witnesses.

■ In support of his argument that gang evidence was relevant, the prosecutor said he might introduce statements from defendant showing that the robbery at the Mad Greek Restaurant was a gang action. He also said he would present evidence from Joe Vargo, a newspaper reporter, who had talked to several gang members about their activities. (It is disputed whether defendant was one of the members who talked to Vargo.) At trial, however, the prosecution did not offer any admissions by defendant that the Mad Greek Restaurant robbery was a gang action. Vargo invoked the protection of the "reporter's shield law" (Evid. Code, § 1070) and refused to testify.

In his opening statement, the prosecutor described the testimony he expected from Joe Vargo. Defendant argues that if his counsel had interviewed Vargo, he would have realized that Vargo would refuse to testify. Counsel then would have known that he could object to the prosecutor's description. There is, however, no evidence in this record that counsel did not interview Vargo before trial, or that counsel lacked a tactical reason for failing to object. Thus on the appellate record defendant's claim of ineffective assistance of counsel must be rejected.

■ Defendant quotes *People v. Cox* (1991) 53 Cal.3d 618, 660 [280 Cal.Rptr. 692, 809 P.2d 351], which said: "When offered by the prosecution, we have condemned the introduction of evidence of gang membership if only tangentially relevant, given its highly inflammatory impact." But here the evidence was more than merely "tangentially relevant" to premeditation, which was at issue as to both the Domino's Pizza murder and the attempted murder charges arising from the Mad Greek Restaurant robbery, because the gang's name itself is evidence of premeditation. Under such circumstances, the trial court acted within its discretion in admitting the evidence. (See *People v. Champion* (1995) 9 Cal.4th 879, 922 [39 Cal.Rptr.2d 547, 891 P.2d 93].)

The defense notes that when the prosecutor rested his case, he elected to proceed solely on a felony-murder theory for the murder of Herman Weeks,

the manager at Domino's Pizza. Defendant argues that once the prosecutor elected to prosecute the Domino's Pizza killing as a felony murder, the trial court should have reconsidered its ruling sua sponte and excluded the gang membership evidence.

Under a felony-murder theory, the prosecution need not prove intent to kill, so the theory that the name of defendant's gang, the 211 187 Hard Way Gangster Crips, implied a premeditated intent to kill during a robbery was no longer relevant to defendant's guilt of the Weeks killing. That reasoning, however, would remain relevant to both the Mad Greek Restaurant attempted murder charges, and to the felony-murder special circumstance for the Weeks killing. (See pt. VII., *post.*)

The defense did not ask the trial court for an instruction limiting the gang membership evidence to the felony-murder special circumstances and the Mad Greek Restaurant attempted murders; the court had no duty to give such a limiting instruction without request. (*People v. Clark* (1992) 3 Cal.4th 41, 130-131 [10 Cal.Rptr.2d 554, 833 P.2d 561]; *People v. Collie* (1981) 30 Cal.3d 43, 64 [177 Cal.Rptr. 458, 634 P.2d 534, 23 A.L.R.4th 776].)

In his closing argument at the guilt phase of defendant's trial, the prosecutor said that defendant's gang was formed "immediately" before the robberies involved in this case and that defendant was the one who named it the 211 187 Hard Way Gangster Crips. Defendant argues that his attorney should have objected to both statements as unsupported by the evidence.

The prosecutor's comment was a trivial exaggeration. The evidence shows that the gang was formed in 1988 and the robberies occurred in January of 1989—soon after the gang was formed, if not exactly "immediately" after its formation. The gang was created by defendant, Bailey, and another person, Montrell. When the gang had only three members, it was known as Three the Hard Way. Later it was named the 211 187 Hard Way Gangster Crips. The record does not indicate whether defendant personally proposed that name, or whether he simply agreed to someone else's proposal.

Because the record does not show whether defense counsel had a tactical purpose in not objecting to the prosecutor's statements, we cannot find ineffective assistance of counsel on the record before us. (*People v. Mendoza Tello, supra,* 15 Cal.4th at pp. 266-267.)

L. *Cumulative Prejudice*

 We have identified two trial court errors at the guilt phase of the trial: (1) sustaining an objection to a question asking whether Najee Muslim

had been accused of being the actual killer, and (2) refusing to reopen testimony to permit identification of photographs of Alan Murfitt and Eric Bailey. Both of these errors are relatively insignificant; neither involves a violation of any federal constitutional right. Even considered cumulatively, there is no reasonable probability (*People v. Brown* (1988) 46 Cal.3d 432, 446-447 [250 Cal.Rptr. 604, 758 P.2d 1135]) that absent the errors the jury would have reached a different result.

## VII. SPECIAL CIRCUMSTANCES

 The only special circumstance alleged and found was felony murder, with robbery and burglary as the underlying felonies. That special circumstance applies when "[t]he murder was committed while the defendant was engaged in, or was an accomplice in, the commission of, attempted commission of, or the immediate flight after committing, or attempting to commit" robbery or burglary. (§ 190.2, subd. (a)(17).)

Section 190.2, subdivision (c) provides: "Every person, not the actual killer, who, with the intent to kill, aids, abets . . . any actor in the commission of murder in the first degree" is subject to the death penalty. Interpreting this provision, *People v. Anderson* (1987) 43 Cal.3d 1104, 1147 [240 Cal.Rptr. 585, 742 P.2d 1306], declared: "[W]hen the defendant is an aider and abettor rather than the actual killer, intent must be proved."[5]

Defendant proposed an instruction directing the jury that the felony-murder special circumstances applied to him only if he intended to kill the victim. The court rejected the instruction. It also refused to give the bracketed portion of CALJIC No. 8.80, which would have told the jury that if it did not find defendant to be the actual killer, then it could find the special circumstance to be true only if it found beyond a reasonable doubt that defendant participated in the robbery with the "the intent to kill."

Defendant contends that the court's refusal of this instruction was error, citing *People v. Garrison* (1989) 47 Cal.3d 746, 789 [254 Cal.Rptr. 257, 765 P.2d 419]. It held: "Where, as here, there was evidence from which a jury could have based its verdict on an accomplice theory, the court erred in failing to instruct that the jury must find that defendant intended to aid another in the killing of a human being." (*Ibid.*, fn. omitted; see also *People v. Williams* (1997) 16 Cal.4th 635, 689 [66 Cal.Rptr.2d 573, 941 P.2d 752]

---

[5]On June 5, 1990, section 190.2 was amended to add new subdivision (d), which provides: "Notwithstanding subdivision (c), every person, not the actual killer, who, with reckless indifference to human life and as a major participant, aids, abets . . . the commission of a felony . . . which results in the death of some person or persons" is subject to the death penalty. This provision does not apply to defendant's crime, which was committed in 1989.

[error in failing to instruct on intent to kill under the multiple-murder special-circumstance theory when the defendant was an aider or abettor].) The Attorney General argues that no instruction on intent to kill is necessary when the defendant does not claim that more than one person was involved in the crime (see, e.g., *People v. Coleman* (1988) 46 Cal.3d 749, 779 [251 Cal.Rptr. 83, 759 P.2d 1260]), or when the evidence shows that defendant was either the actual killer or not involved in the crime at all (see, e.g., *People v. Hardy* (1992) 2 Cal.4th 86, 193 [5 Cal.Rptr.2d 796, 825 P.2d 781]; *People v. Warren* (1988) 45 Cal.3d 471, 487 [247 Cal.Rptr. 172, 754 P.2d 218]). But such cases are inapposite here, where two persons were involved in the robbery and the evidence does not preclude the possibility that defendant was not the one who shot the victim.

It is nevertheless doubtful whether there was sufficient evidence to justify the proposed instructions. Defendant now claims that his principal defense was that, although he was a participant and guilty of felony murder, he was not the actual killer. But this is a construct on appeal. Defense counsel at trial simply tried to discredit each of the prosecution witnesses; the defense made no claim, and offered no evidence, that defendant was present during the killing but not the actual killer. It might be possible to support the defense argument here by going through the testimony of the prosecution witnesses selectively, accepting testimony showing defendant was present but rejecting other testimony of the same witnesses showing defendant was the actual killer. On the whole record, however, it is a very weak basis for claiming error in the trial court's failure to instruct.

Defendant argues that, even though the evidence to support his proposed instructions was sparse, under *Enmund v. Florida* (1982) 458 U.S. 782 [102 S.Ct. 3368, 73 L.Ed.2d 1140] and *Cabana v. Bullock* (1986) 474 U.S. 376 [106 S.Ct. 689, 88 L.Ed.2d 704], an intent to kill instruction is required whenever the other instructions permit the jury to impose the death penalty on a defendant "without ever finding that he had killed, attempted to kill, or intended to kill." (*Cabana,* at p. 382 [106 S.Ct. at p. 695].) The Attorney General, citing *Tison v. Arizona* (1987) 481 U.S. 137, 154 [107 S.Ct. 1676, 1686, 95 L.Ed.2d 127], responds that intent to kill is not essential to imposing the death penalty for felony murder when the defendant, although not necessarily the actual killer, was "a major actor in a felony in which he knew death was highly likely to occur." Defendant asserts that *Tison* does not apply here because the killing of Weeks at Domino's Pizza was unexpected and unnecessary to the robbery, but that proposition is debatable; in light of the earlier incident at the Mad Greek Restaurant, anyone joining defendant and his friends in an armed robbery might well expect that a shooting would occur.

We have reviewed the closing arguments of counsel on both sides to see to what extent they discussed the possibility that defendant was only an accomplice to the actual killer. Both mentioned it, but only briefly and tangentially. In reviewing the testimony of Erin Burton, defense counsel pointed out that although defendant admitted doing the "Domino's thing," he did not expressly tell her he was the actual killer. But because the trial court had already refused defendant's proposed instructions on actual intent under the felony-murder special circumstance, defense counsel may have believed it pointless to pursue the matter because the instructions the court had decided to give made no distinction between the actual killer and a coparticipant.

A comment from the prosecutor also touches on the issue. At closing argument the prosecutor observed correctly that under the felony-murder rule defendant would be guilty of first degree murder if he intended to rob the victim: "If he had the intent to commit a robbery or burglary he's guilty of murder. Unintentional, intentional, or accidental, it doesn't matter." But the prosecutor then went on, without objection, to tell the jury that the felony-murder special circumstance was "basically the same thing as the felony-murder rule"—which is not true when accomplice liability is in issue. Defendant does not claim that this comment was misconduct, or that defense counsel's failure to object to it denied defendant his right to the effective assistance of counsel. He argues, instead, that it shows that the jurors could have thought the felony-murder special circumstance flowed automatically from their conclusion that defendant was guilty of felony murder, without deciding whether defendant was the actual killer or intended to kill.

In any case, even assuming it was error for the trial court here not to instruct on accomplice liability for the felony-murder special circumstances, the failure to do so was not prejudicial, as discussed below.

■■■ "[W]hen a trial court fails to instruct the jury on an element of a special circumstance allegation, the prejudicial effect of the error must be measured under the test set forth in *Chapman v. California* (1967) 386 U.S. 18, 24 [87 S.Ct. 824, 828, 17 L.Ed.2d 705, 24 A.L.R.3d 1065]. [Citations.] Under that test, an error is harmless only when, beyond a reasonable doubt, it did not contribute to the verdict." (*People v. Williams, supra,* 16 Cal.4th at p. 689.)

■■■ The Attorney General argues that the error is harmless because the jury necessarily found that defendant was the actual killer when it returned a verdict finding that he personally used a firearm in the commission of the Domino's Pizza robbery and murder. (See *People v. Jennings* (1991) 53

Cal.3d 334, 387 [279 Cal.Rptr. 780, 807 P.2d 1009]; *People v. Sedeno* (1974) 10 Cal.3d 703, 721 [112 Cal.Rptr. 1, 518 P.2d 913].) The finding of personal use, however, would not in itself prove defendant was the actual killer. If two robbers display guns to intimidate robbery victims and one shoots and kills a victim, both robbers could be found to have personally used a gun in the robbery and the felony murder, even though only one is the actual killer. (See *People v. Lerma* (1996) 42 Cal.App.4th 1221, 1226 [50 Cal.Rptr.2d 580].)

The Attorney General further argues, however, that the evidence shows only one robber, the actual killer, displayed and used a gun at Domino's Pizza. The record supports this argument. On direct examination, the prosecutor asked Christina Kane, the assistant manager at Domino's Pizza: "Why were you looking at the defendant? In other words, why were you watching him as opposed to the other guy?" She replied, "Because he's the one that had the gun." Later the prosecutor asked: "Would it be fair to say, Ms. Kane, that your primary attention that evening during these events was focused on the defendant as opposed to the other individual?" She answered: "Primary? Probably, yes, because he had a gun in his hand and I was scared." On cross-examination, defense counsel asked Kane: "Now, going back to January 21st, 1989, the two individuals that came in, the two black men that came into Domino's Pizza, did you see one before you saw the other?" Kane replied: "Yes. One walked in front of the other." Defense counsel asked: "Okay. Which one walked in first; the one with the gun or the one without the gun?" Kane answered: "With the gun." Later, in a series of questions and answers, Kane was asked to describe the two individuals, who were distinguished as "the one with the gun" and "the man without the gun." Victor Moreno, a customer at Domino's Pizza, confirmed that only one robber had a gun.

Defendant points to evidence that defendant displayed a gun as he ran from Domino's Pizza to Cruz's getaway car, and argues that possibly the jury could have based its personal use finding on defendant's display of a gun while he fled the scene of the murder. Defendant conjectures that maybe both Domino's Pizza robbers had guns, that the second robber displayed his during the robbery and murdered restaurant manager Herman Weeks, but that defendant drew his gun only as he fled to Cruz's car. It is, of course, far more likely that the man who displayed the gun at Domino's Pizza and shot Weeks is the same person who displayed a gun as the robbers fled the scene. All evidence points to defendant, not the second robber, as the one with the gun. We conclude that the jury found defendant to be the actual killer and hence that any instructional error was harmless beyond a reasonable doubt. (*Chapman v. California, supra,* 386 U.S. at p. 24 [87 S.Ct. at p. 828].)

## VIII. PENALTY

### A. *The Prosecutor's Reference to Gang Evidence*

At the penalty phase, defendant presented favorable character evidence through witnesses Beatrice Acosta (the mother of defendant's child), Cyndy Pitts (defendant's mother), Joseph Gueste (defendant's pastor), and Glenn Garbot (defendant's uncle). On cross-examination, the prosecutor asked those witnesses if they knew that defendant was a member of a Crips gang. Defendant contends these questions constituted misconduct and violated a ruling by the trial court that it would preview any gang evidence introduced at the penalty trial before the jury heard it. He further contends that the questions denied him his state and federal constitutional rights to due process of law and a reliable penalty determination, and that defense counsel's failure to object to the questions unconstitutionally deprived him of the effective assistance of counsel.

The jury had already heard gang evidence at the guilt phase of the trial, and we have previously concluded that the evidence was admissible. The prosecutor's questions to defendant's character witnesses did not elicit any additional evidence of gang activity. The prosecutor asked defendant's character witnesses if they knew of defendant's gang membership and activities, and how this would affect their opinion of defendant. The witnesses all answered that they did not know of any such matters, so no evidence on gang membership was presented through their testimony.

The purpose of the prosecutor's questions was to rebut defendant's character evidence by showing that the witnesses were not aware of discreditable aspects of defendant's life. Once defendant had placed his character in issue, the prosecutor was entitled to rebut defendant's evidence with evidence that would offer a more balanced picture of his personality. Here, "[m]embership in youth gangs was relevant to the issue of defendant's character and activities as a youth and specifically rebutted the direct testimony of the witness[es]." (*People v. Fierro* (1991) 1 Cal.4th 173, 238 [3 Cal.Rptr.2d 426, 821 P.2d 1302]; see *People v. Rodriguez* (1986) 42 Cal.3d 730, 790-792 [230 Cal.Rptr. 667, 726 P.2d 113].)

Defendant calls our attention to *People v. Ramirez* (1990) 50 Cal.3d 1158 [270 Cal.Rptr. 286, 791 P.2d 965], where we said: " 'Nothing in our discussion is meant to imply that *any* evidence introduced by defendant of his "good character" will open the door to *any and all* "bad character" evidence the prosecution can dredge up. As in other cases, the scope of rebuttal must be specific, and evidence presented or argued as rebuttal must relate directly

to a particular incident or character trait defendant offers in his own behalf.' " (*Id.* at pp. 1192-1193, quoting *People v. Rodriguez, supra,* 42 Cal.3d at p. 792, fn. 24, italics added in *Rodriguez.*) But defendant's witnesses did not limit themselves to describing defendant's childhood; each of them said that the charged criminal conduct was "out of character" for defendant, or words to that effect. The prosecution was entitled to inquire if the witnesses were familiar with defendant's more recent character and behavior, that of a member and leader of a criminal gang.

Defendant argues that trial counsel should have inquired exactly what defense character evidence would open the door to prosecution questions about gang membership so defense counsel could limit his examination of the character witnesses to avoid such questions. Defendant claims there is no conceivable tactical purpose for not making that inquiry.

We disagree. Knowing that the jury had already heard the gang evidence, but had not heard defendant's character evidence, defense counsel here could reasonably conclude that he should present character evidence despite any risk of rebuttal by the prosecution.

That we can hypothesize a reasonable tactical basis for defense counsel's conduct does not, of course, prove that counsel did have a reasonable tactical basis for his action or inaction. But to support a claim of ineffective assistance of counsel, defendant must prove that counsel had no such tactical purpose. (*People v. Michaels, supra,* 28 Cal.4th at p. 526.) The record on appeal does not furnish such proof.

### B. *Calling Dr. Buckey as a Defense Witness at the Penalty Phase*

 The defense called Dr. Steven Buckey, a clinical psychologist, as an expert witness at the penalty trial. Dr. Buckey described the problems experienced by children of families with alcoholism and domestic violence. He said that defendant's behavior problems were related to having an alcoholic and abusive parent, as well as to defendant's own alcoholism. He did not, however, talk to defendant about the charged crimes or connect defendant's problems with any specific mitigating factor.

On cross-examination by the prosecutor, Dr. Buckey acknowledged that defendant's behavior also indicated an antisocial personality and that defendant's alcoholism itself was symptomatic of an antisocial personality. He agreed with the prosecutor that defendant is a person "who doesn't have a conscience" and said defendant would be "very difficult, if not impossible, to treat in any setting." Defendant argues that, on the whole, Dr. Buckey's testimony was harmful rather than helpful.

Defendant thus contends that he was denied his state and federal constitutional rights to the effective assistance of counsel as a result of his attorney's decision to call Dr. Buckey as a witness. The record, however, sheds no light on whether counsel's action was a reasonable tactical choice. It does not describe counsel's interviews with Dr. Buckey, what counsel did to prepare Dr. Buckey for cross-examination, or what other expert witnesses might have been available. Thus on appeal we cannot determine whether defense counsel acted incompetently in calling Dr. Buckey as an expert witness.

C. *Failure to Instruct on Nonstatutory Aggravating Factors*

In *People v. Boyd* (1985) 38 Cal.3d 762, 772 [215 Cal.Rptr. 1, 700 P.2d 782], this court held that under the 1978 death penalty law (as amended, still California's death penalty law), a death judgment could not be based on aggravating factors not listed in section 190.3. Defendant complains that the jury was not expressly instructed not to consider nonstatutory aggravating factors. But he does not point to any nonstatutory aggravating factors that were presented to or argued to the jury. Thus defendant's claim raises no issue for decision here.

D. *Failure to Instruct and Argue That Certain Factors Can Only Be Mitigating*

■ Defendant argues the trial court should have instructed the jury that defendant's lack of prior felony convictions (§ 190.3, factor (c)) was a mitigating factor and that extreme mental illness (*id.*, factor (d)) and age (*id.*, factor (i)) can only be mitigating factors. The trial court's failure to do so, he maintains, violated his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the federal Constitution and corresponding state provisions.

We have consistently rejected contentions that the trial court has a duty to instruct on which factors are aggravating and which mitigating. In *People v. Zapien* (1993) 4 Cal.4th 929, 990 [17 Cal.Rptr.2d 122, 846 P.2d 704], we said that the factors listed in section 190.3 " 'properly require the jury to concentrate upon the circumstances surrounding both the offense and the offender, rather than upon extraneous factors having no rational bearing on the appropriateness of the penalty. We believe the aggravating or mitigating nature of these various factors should be self-evident to any reasonable person within the contest of each particular case.' " Likewise in *People v. Carpenter* (1997) 15 Cal.4th 312, 420 [63 Cal.Rptr.2d 1, 935 P.2d 708], we observed: "Although some of the statutory factors are inherently only aggravating or mitigating [citation], because this is self-evident, the court need not identify which is which."

Prior felony convictions (§ 190.3, factor (c)) would ordinarily be an aggravating consideration. Defendant's complaint here is that the trial court did not instruct the jury that the absence of any prior convictions was mitigating. Defendant, however, did not request such an instruction. In any case, the court's instruction on section 190.3, factor (k), permitting the jury to consider any "aspect of the defendant's character or record that the defendant offers as a basis for a sentence less than death" clearly authorizes the jury to consider defendant's lack of prior felony convictions.

Section 190.3, factor (d) refers to "extreme mental illness or emotional disturbance." This court has rejected the contention that the language of factor (d) is unconstitutional because it improperly bars the jury from considering less-than-extreme mental illness or emotional disturbance, holding that the jury can consider such circumstances under section 190.3, factor (k). (E.g., *People v. Roybal* (1998) 19 Cal.4th 481, 523 [79 Cal.Rptr.2d 487, 966 P.2d 521].)

Defendant here faults the trial court for not instructing the jury that section 190.3, factor (d) can only be a mitigating factor. He fears that the jury might have reasoned that extreme mental illness predisposing a person to violence could be an aggravating consideration. This issue has arisen twice before, in *People v. Carpenter, supra,* 15 Cal.4th 312, 420, and in *People v. McPeters* (1992) 2 Cal.4th 1148, 1191 [9 Cal.Rptr.2d 834, 832 P.2d 146]. In both cases we concluded that nothing in the arguments or instructions suggested that extreme mental illness could be an aggravating factor.

Here, the prosecutor did not argue that defendant's mental illness was aggravating; defendant, he declared, "was not suffering from any mental or extreme emotional distress." Although the prosecutor went on to argue that defendant had a "lust for violence" and might be a sociopath, that argument was proper to rebut defendant's evidence that his crimes were the result of his chaotic upbringing and alcoholism, and to anticipate defense counsel's argument that defendant had not been violent in prison and could be a positive influence on his brother and son.

Defendant also contends that the trial court should have told the jury that youth is a mitigating factor. We cannot agree. Age, section 190.3, factor (i), is not necessarily a mitigating consideration. It is a neutral factor, and thus either counsel may make any age-related inference as either aggravating or mitigating. (See *People v. Hawthorne* (1992) 4 Cal.4th 43, 77 [14 Cal.Rptr.2d 133, 841 P.2d 118]; *People v. Lucky* (1988) 45 Cal.3d 259, 302 [247 Cal.Rptr. 1, 753 P.2d 1052].) Although a young age may generally be mitigating, that is not necessarily true in this case; at the age of 18 defendant

had already committed one murder, two robberies, and several attempted murders. Thus, contrary to defendant's contention, trial counsel could have made a reasonable tactical decision not to argue the issue. The record does not show the actual basis of counsel's decision.

E. *Failure to Present Evidence of Lingering Doubt at the Penalty Trial, or to Argue That Issue*

■ We reject defendant's contention that the failure of his counsel to argue lingering doubt as a mitigating consideration denied defendant the effective assistance of counsel. We have held that a defendant may argue lingering doubt at the penalty phase of a capital trial as a mitigating consideration. (*People v. Kaurish* (1990) 52 Cal.3d 648, 706 [276 Cal.Rptr. 788, 802 P.2d 278].) "Judges and juries must time and again reach decisions that are not free from doubt; only the most fatuous would claim the adjudication of guilt to be infallible. The lingering doubts of jurors in the guilt phase may well cast their shadows into the penalty phase and in some measure affect the nature of the punishment." (*People v. Terry* (1964) 61 Cal.2d 137, 146 [37 Cal.Rptr. 605, 390 P.2d 381]; *People v. Cox, supra,* 53 Cal.3d at pp. 677-678.) But a defendant may not introduce evidence intended to create a reasonable doubt that "is not relevant to the circumstances of the offense or the defendant's character and record." (*In re Gay* (1998) 19 Cal.4th 771, 814 [80 Cal.Rptr.2d 765, 968 P.2d 476].)

The lingering doubt evidence defendant refers to related to whether Andre Davis might have been the actual killer, an issue first raised on defendant's motion for new trial, and discussed in part IX., *post.* Such evidence might have been admissible in the penalty phase of the trial because it relates to the circumstances of the offense, a potential mitigating or aggravating factor. (See § 190.3, factor (a).) As we observe later in our discussion of the new trial motion, the appellate record is insufficient to determine whether defendant's counsel was incompetent in not producing such evidence. Having failed to produce evidence that would show grounds for a lingering doubt, however, it is not reasonably possible (*People v. Brown, supra,* 46 Cal.3d at p. 447; *People v. Robertson* (1982) 33 Cal.3d 21, 63 [188 Cal.Rptr. 77, 655 P.2d 279] (conc. opn. of Broussard, J.)) that counsel could have avoided a death verdict merely by arguing lingering doubt to the jury.

F. *Constitutionality of the California Death Penalty Law*

Defendant contends that numerous features of the California death penalty law, and the absence of other features that might protect against unfair or

unreliable verdicts, violate the Eighth Amendment to the United States Constitution and parallel California constitutional provisions. He emphasizes California's failure to require that the jury find aggravating circumstances outweigh mitigating circumstances beyond a reasonable doubt before it can return a death verdict. He also briefly raises a number of other contentions that this court has previously rejected.

### 1. *Absence of a requirement that the jury find aggravating circumstances outweigh mitigating circumstances beyond a reasonable doubt*

 In *People v. Williams* (1988) 44 Cal.3d 883, 960 [245 Cal.Rptr. 336, 751 P.2d 395], we said that application of a reasonable doubt standard at the penalty phase is inappropriate because the decision "is a normative judgment reflecting the juror's individual moral assessment of the defendant's culpability." Thereafter, in *People v. Sanchez* (1995) 12 Cal.4th 1, 80 [47 Cal.Rptr.2d 843, 906 P.2d 1129], we affirmed that the federal Constitution does not require a jury to find that aggravating circumstances outweighed mitigating circumstances beyond a reasonable doubt. Noting that the United States Supreme Court has never directly decided this issue, defendant asks us here to reconsider our past decisions.

Defendant points out that several states do require a reasonable doubt standard for the penalty decision, suggesting that there is nothing inappropriate in the use of that standard. He then quotes from *Eddings v. Oklahoma* (1982) 455 U.S. 104, 112 [102 S.Ct. 869, 875, 71 L.Ed.2d 1]: "[C]apital punishment [must] be imposed fairly, and with reasonable consistency, or not at all." That language, however, did not impose a requirement that all states use the same procedures in determining penalty. The requirement of "reasonable consistency" must be understood to mean consistency within a state; there is, for example, no requirement that all states use the same aggravating and mitigating factors.

Defendant further argues that the decision whether to require proof beyond a reasonable doubt is one made by weighing the social interests at stake. Among the many examples he cites are *In re Winship* (1970) 397 U.S. 358 [90 S.Ct. 1068, 25 L.Ed.2d 368] (juvenile court adjudication) and *People v. Feagley* (1975) 14 Cal.3d 338 [121 Cal.Rptr. 509, 535 P.2d 373] (commitment as mentally disordered sex offender). All of the cases cited, however, involve an adjudication of guilt or status. Such adjudications are analogous to the guilt phase determination in a capital trial, which is governed by the reasonable doubt standard.

The penalty decision, on the other hand, is the counterpart of judicial sentencing in a noncapital case. A trial judge imposing a sentence has never been required to believe that the considerations on which it is based have been proved beyond a reasonable doubt, whether or not the sentencing decision involves issues of great social interest. To the contrary, in imposing a sentence the judge may consider actions and offenses that have not been proved beyond a reasonable doubt. (See *People v. Gragg* (1979) 216 Cal.App.3d 32, 44-45 [264 Cal.Rptr. 765].) The requirement that prior criminal conduct asserted as an aggravating consideration under factors (b) and (c) of section 190.3 be proven beyond a reasonable doubt is imposed by statute, not by the state or federal Constitution. (*People v. Anderson* (2001) 25 Cal.4th 543, 589 [106 Cal.Rptr.2d 575, 22 P.3d 347].)

The Legislature, by vesting the penalty decision in the jury instead of the judge, recognized the importance of the social interests at stake in a capital trial. (See *People v. Bacigalupo* (1993) 6 Cal.4th 457, 470 [24 Cal.Rptr.2d 808, 862 P.2d 808].) But entrusting that decision to a jury does not automatically carry with it a requirement that the jury's decision be made by a reasonable doubt standard. *(People v. Bolden* (2002) 29 Cal.4th 515, 566 [127 Cal.Rptr.2d 802, 58 P.3d 931]; *People v. Kipp* (2001) 26 Cal.4th 1100, 1137-1138 [113 Cal.Rptr.2d 27, 33 P.3d 450].)

In conclusion, California death penalty statutes do not provide for a burden of proof in the weighing of aggravating and mitigating circumstances, and no constitutional authority imposes that requirement. (*People v. Michaels, supra,* 28 Cal.4th at p. 541, and cases there cited.) We therefore adhere to our decisions rejecting defendant's contention.

2. *Narrowing the class of death-eligible defendants*

Defendant argues that section 190.3 does not sufficiently narrow the class of murderers eligible for the death penalty. (See *Zant v. Stephens* (1983) 462 U.S. 862, 877-878 [103 S.Ct. 2733, 2742-2743, 77 L.Ed.2d 235]; *People v. Bacigalupo, supra,* 6 Cal.4th at pp. 465-466.) As in *People v. Wader* (1993) 5 Cal.4th 610, 669 [20 Cal.Rptr.2d 788, 854 P.2d 80], "defendant has not demonstrated on this record, or through sources of which we might take judicial notice, that his claims are empirically accurate, or that, if they were correct, this would require the invalidation of the death penalty law."

The statistics defendant cites are drawn solely from published decisions of this court and the Court of Appeal, reviewing cases in which a defendant

was found guilty. As defendant recognizes, this is obviously a skewed sample. It omits all unpublished decisions, and all cases in which the defendant did not appeal, groups likely to include a higher proportion of cases without special circumstances. Thus defendant's figures fail to show the extent to which the California statute narrows the proportion of death-eligible murderers.

### 3. *Jury instruction on weighing aggravating and mitigating factors*

CALJIC No. 8.88 instructs the jury that it may impose a death sentence if the aggravating circumstances are "so substantial in comparison with the mitigating circumstances that it warrants death instead of life without parole." The jury was so instructed in this case.

Defendant raises three objections to this instruction. First, he contends it allows the jury to impose a death penalty even if death is not the appropriate penalty, an argument we rejected in *People v. Arias* (1996) 13 Cal.4th 92, 171 [51 Cal.Rptr.2d 770, 913 P.2d 980]. Second, he argues the instruction does not tell the jury that it may not impose the death penalty unless aggravating circumstance outweigh mitigating circumstances, an argument we rejected in *People v. Wader, supra,* 5 Cal.4th at page 662. Finally, he asserts that the instruction does not inform the jury that it cannot return a death verdict if mitigation outweighs aggravation, an argument we rejected in *People v. Hughes* (2002) 27 Cal.4th 287, 405 [116 Cal.Rptr.2d 401, 39 P.3d 432].

 Defendant also contends that CALJIC No. 8.88 creates a presumption of death. His theory is that a case does not reach the penalty stage unless there is a special circumstance, and the jury is unlikely to view that special circumstance as insubstantial. But CALJIC No. 8.88 does not mandate death whenever aggravating factors are substantial; instead, it requires a weighing of those factors in relation to the mitigating factors.

### 4. *Other issues*

Defendant contends that the aggravating circumstances listed in section 190.3, especially factors (a) (circumstances of the crime) and (b) (criminal activities involving force or violence), are unconstitutionally vague. The same argument was rejected by the United States Supreme Court in *Tuilaepa v. California* (1994) 512 U.S. 967, 975-976 [114 S.Ct. 2630, 2636-2637, 129 L.Ed.2d 750], and by this court in numerous cases. (See *People v. Kipp, supra,* 26 Cal.4th 1100, 1137, and cases cited therein.) The trial

court is not required to specify which factors are aggravating or mitigating nor to delete any inapplicable mitigating factors from the list of factors presented to the jury. (*People v. Davenport* (1995) 11 Cal.4th 1171, 1230 [47 Cal.Rptr.2d 800, 906 P.2d 1068].) The trial court is not required to instruct the jury that a sentence of life imprisonment without possibility of parole means that defendant will never be paroled, and a sentence of death means that defendant will be executed. (*People v. Jones* (1997) 15 Cal.4th 119, 189 [61 Cal.Rptr.2d 386, 931 P.2d 960].) Evidence about a "day in the life" of a prisoner on death row, or the effect of a life without possibility of parole sentence, is not admissible. (*People v. Daniels* (1991) 52 Cal.3d 815, 876-877 [277 Cal.Rptr. 122, 802 P.2d 906].) This court has repeatedly rejected arguments that the prosecutor's discretion in deciding whether to seek the death penalty is unconstitutional. (See, e.g., *People v. Stanley* (1995) 10 Cal.4th 764, 843 [42 Cal.Rptr.2d 543, 897 P.2d 481].)

Finally, defendant contends that all of the specified aggravating and mitigating factors are unconstitutionally vague. This catchall argument fails. Earlier in this opinion we cited authority holding that factors (a), (b), and (d) of section 190.3 are not unconstitutionally vague. (*Ante,* at pp. 1123-1125.) In the absence of a more focused argument we need not examine the remaining factors.

In another catchall contention, defendant asserts that California's failure to adopt penalty phase safeguards found in the statutes of other states renders the California law unconstitutional. Defendant says that in the course of discussing other issues, he has mentioned various safeguards used by other states, but that none is in effect in California. He presents no additional argument or authority here to show that such safeguards are constitutionally required. Citation to procedures used in other states, unaccompanied by any argument to show that California is constitutionally compelled to adopt such procedures, does not raise any issue we must consider.

## IX. MOTION FOR NEW TRIAL

In his motion for a new trial, defendant asserted trial counsel's incompetence for not using due diligence to locate Andre Davis, the man defendant claims was the actual shooter. In his motion for new trial, defendant presented evidence that early in 1991 counsel attempted to locate Davis through the California Prison Locator Office, but that office could not help him without a date of birth for Davis. On June 19, 1991, Talea Muslim, Davis's aunt, told defense investigator Robin Levinson she thought that Davis was born in August 1973. But counsel heard from another source that

Davis was in Oklahoma, so he did not follow up on what he had learned from Talea. Levinson spoke to the investigator for Eric Bailey, who according to the police was defendant's accomplice in the Domino's Pizza murder. Bailey's counsel used the August 1973 birth date to locate Davis at California's Sierra Conservation Center at Jamestown. Bailey's counsel did not tell defendant's attorney where Davis could be found, but did have Davis transported to the Riverside jail to be available for Bailey's trial. When the prosecution's investigator observed Davis at the jail, he told the prosecutor that Davis closely resembled the composite sketch of the second robber drawn by a police artist and prepared with the help of Christina Kane, a witness to the Domino's Pizza murder. The prosecutor then dropped charges against Bailey.

After hearing this evidence, the trial court found that defense counsel failed to use due diligence to locate Davis, a finding that the Attorney General does not contest. The trial court further found, however, that counsel's lack of diligence did not prejudice defendant.

Defendant contends that if Davis had been available, defendant would have testified and said Davis was the shooter. He would then have called Davis as a witness, and although Davis might have denied being present at the killing of Herman Weeks at Domino's Pizza, or refused to testify, the jury could have observed Davis and noticed his resemblance to the composite sketch. According to defendant, before Herman Weeks died of his injuries he said that the killer wore an earring, and the defense could have presented evidence that Davis, unlike defendant, wore an earring. Defendant asserts that Christina Kane could have been confronted with Davis and asked if he was one of the robbers. And evidence that Davis was one of the robbers, even if not the killer, would have impeached the testimony of Najee Muslim, who testified that Davis was not present at the robbery and described Bailey as the second robber.

On the record before us, however, all of this is a speculative venture into an alternate history. If defendant had testified, he could have said Davis was the killer, but the details would be important, and the testimony subject to impeachment. We do not know whether Davis would have testified favorably or unfavorably for defendant, or would have refused to testify. Neither do we know how Christina Kane would have reacted to seeing Davis in the court. The prosecutor might have had rebuttal evidence. Defendant describes a trial that did not happen, and it is not possible to reconstruct it on the appellate record. Defendant's remedy, if he can produce the requisite evidence, is through a petition for habeas corpus.

## DISPOSITION

The judgment is affirmed.

George, C. J., Baxter, J., Werdegar, J., Chin, J., Brown, J., and Moreno, J., concurred.

Appellant's petition for a rehearing was denied August 27, 2003. Werdegar, J., did not participate therein.