Filed 9/23/25  P. v. Black CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Siskiyou)

----

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>WILLIAM ALLEN BLACK,<br><br>    Defendant and Appellant. | C101192<br><br>(Super. Ct. No. SCSC-CRF-2001-266-2)<br><br>ORDER MODIFYING OPINION [NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the opinion filed herein on September 18, 2025, be modified as follows:

On page 11, near the end of the first full paragraph beginning "Given that the jury had two paths . . . ," the sentence beginning "Even in those excerpts" the word "defendant" should be changed to "A.D." so that the entire sentence reads:  "Even in those excerpts, there is testimony that Westfall also kicked and hit A.D. during the relevant assault."

1

There is no change in judgment.

BY THE COURT:

_____
HULL, Acting P. J.

_____
ROBIE, J.

_____
MESIWALA, J.

Filed 9/18/25  P. v. Black CA3 (unmodified opinion)

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Siskiyou)

----

|  |  |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>  v.<br><br>WILLIAM ALLEN BLACK,<br><br>        Defendant and Appellant. | C101192<br><br>(Super. Ct. No. SCSC-CRF-2001-266-2) |

In December 2001, a jury found defendant William Allen Black guilty of murder and conspiracy to pervert or obstruct justice.  Defendant appeals from the trial court's denial of his Penal Code section 1172.6 petition.  (Statutory section citations that follow are found in the Penal Code unless otherwise stated.)  While defendant originally filed his petition under former section 1170.95, effective June 30, 2022, the Legislature renumbered former section 1170.95 to section 1172.6 without substantive changes.  (Stats. 2022, ch. 58, § 10.)  We will cite to the current section throughout this opinion.

1

Defendant argues the trial court erred in denying his section 1172.6 petition at the prima facie stage because the record of conviction does not conclusively establish his ineligibility for relief. We agree and will remand the matter for an evidentiary hearing.

## FACTS AND HISTORY OF THE PROCEEDINGS

A jury found defendant guilty of murder and conspiracy to pervert or obstruct justice. (§§ 187, subd. (a), 182, subd. (a)(5).) The jury also found true defendant personally used a deadly weapon in committing the murder. (§ 12022, subd. (b)(1).) The trial court sentenced defendant to 15 years to life in state prison for the murder plus two years for the conspiracy charge and one year for the use of a deadly weapon enhancement.

The underlying facts are recited in our unpublished decision in *People v. Black* (Dec. 23, 2003, C041080) [partial pub. opn.] (*Black*). We provide a brief summary of these facts as context for the charge filed against defendant, recognizing factual summaries from appellate opinions "may not be used to determine a petitioner's eligibility at the prima facie stage" of a section 1172.6 proceeding. (§ 1172.6, subd. (d); *People v. Lee* (2023) 95 Cal.App.5th 1164, 1183.) This factual summary has no bearing on our resolution of this appeal.

One night, R.W. drove defendant and Teresa Westfall to the home of the murder victim, A.D. To protect their privacy, we refer to the victims by their initials. (Cal. Rules of Court, rule 8.90, subd. (b)(4), (10).) A.D. was 65 years old and had numerous health conditions which meant he would not live much longer and could not have put up much of a fight against an attack. (*Black*, *supra*, C041080.)

That night, A.D. and defendant argued and A.D. said defendant should leave A.D.'s home. At another point in the night, A.D. reached out for Westfall but did not touch her. Concerned, Westfall asked defendant if A.D. would hurt them and defendant assured her A.D. had never done so before. (*Black*, *supra*, C041080.)

Westfall testified she heard A.D. say, "You fuckers, get out." She awoke to A.D. wielding an axe and also saying, "kill you fuckers." He hit her in the lip with the flat side of the axe. (*Black, supra,* C041080.)

Westfall saw defendant and A.D. wrestling next to the stove. Defendant used the heel of one of his boots to hit A.D. in the face three or four times. Defendant also choked A.D. and stomped on him three times in the chest and stomach. Westfall picked up the axe and handed it to defendant, saying, "This is what he hit me with." Defendant told A.D. to go to sleep. Westfall did not see A.D. hit or threaten defendant. (*Black*, *supra,* C041080.)

As Westfall reached for her shoes, A.D. grabbed for her foot and she kicked him two or three times in the groin and the chest or only a single time. *(Black, supra*, C041080.)

Westfall then fell asleep on the couch. When she awoke, defendant had cleaned up, was reading the Bible, and crying. (*Black, supra*, C041080.)

After they left A.D.'s house, defendant called K.L. and told her A.D. had chopped Westfall's face with an axe and Westfall needed a ride to the hospital. When K.L. asked defendant where A.D. was, defendant responded A.D. was at home and he "got what he deserved." (*Black*, *supra,* C041080.)

A.D. died from blunt force injuries to the chest and abdomen and suffered extensive internal trauma with injuries to his kidneys, liver, and heart, any of which would have eventually caused his death. The pathologist opined the bruising on his body could not have been caused by one or two blows or kicks but was consistent with repeated kicks or stomps delivered by a person of defendant's size wearing boots. (*Black, supra*, C041080.)

B.B. picked up defendant and Westfall. Defendant told B.B. that defendant and A.D. had gotten into a fight and A.D. had hit Westfall, but failed to mention A.D. was injured. (*Black, supra*, C041080.)

3

Defendant also called his parents and told them about the fight and admitted A.D. might be dead at his home. Defendant's father told him to call the police and get an ambulance. Defendant spoke to a deputy sheriff who also told him to contact law enforcement. Defendant did not do so. (*Black, supra*, C041080.)

During a visit with friends, defendant told Westfall she should claim she killed A.D. in self-defense. (*Black, supra*, C041080.) The two then traveled to Westfall's grandmother's house where defendant exchanged his boots for a different pair. (*Black, supra*, C041080.)

Defendant contacted a former girlfriend, A.B., and asked her husband J.B. for a ride and some money. When they met up, defendant was not surprised when A.B. told him he was a wanted man. Defendant admitted he pushed A.D. down, kicked him in the stomach and choked him. (*Black, supra*, C041080.)

After defendant was arrested, a fellow jail inmate testified defendant told him the following: Defendant had been charged with murdering his girlfriend's father or stepfather, "an 'old alcoholic.' " A.D. tried to molest Westfall on her way to the bathroom. After that, A.D. told defendant to get out and hit defendant with an axe. Defendant took the axe away and beat A.D. to the floor, where he lay hurt and motionless. Defendant did not know if A.D. was alive or dead, and defendant stepped outside to cool off. When he came back in, defendant saw Westfall on top of A.D., hitting him. Defendant then hit A.D. in the head with an axe, punched him in the face, and kicked him in the body. Defendant said he and Westfall were in shock because A.D. was badly hurt and later concluded he was dead. (*Black, supra*, C041080.)

In letters defendant sent to Westfall while he was in jail, defendant said he wanted to get married because if she were his wife, she would not have to testify against him. (*Black, supra*, C041080.)

4

Defendant put on evidence designed to suggest Westfall's perception of the events and recollection were impaired by drugs or alcohol. (*Black, supra*, C041080.) Defendant also challenged the credibility of the jailhouse informant. (*Black, supra*, C041080.)

On the subject of murder, the trial court informed the jury that defendant had been accused of murder and gave the following instruction: "Every person who unlawfully kills a human being with malice aforethought is guilty of the crime of murder in violation of section 187 of the Penal Code. [¶] A killing is unlawful if it is neither justifiable or excusable. [¶] In order to prove this crime, the crime of murder, each of the following elements must be proved: one, a human being was killed, the killing was unlawful, and the killing was done with malice aforethought. [¶] Now, what's malice aforethought? You need a definition. [¶] Malice may be either express or implied. Malice is express when there is manifested an intention unlawfully to kill a human being. [¶] Malice is implied when the killing resulted from an intentional act, the natural consequences of the act are dangerous to human life, and the act was deliberately performed with knowledge of the danger to and with the conscious disregard for human life. [¶] When it is shown that a killing resulted from the intentional doing of an act with express or implied malice, no other mental state need be shown to establish the mental state of malice aforethought." On the question of second degree murder, the trial court instructed the jury, "Murder of the second degree is also the unlawful killing of a human being with malice aforethought when the perpetrator intended unlawfully to kill a human being but the evidence is insufficient to prove deliberation and premeditation." The trial court also provided instructions on deliberation and premeditation.

On the subject of aiding and abetting, the trial court also instructed: "Persons who are involved in committing a crime are referred to as principals in that crime. Each principal, regardless of the extent or manner of participation, is equally guilty. [¶] Principals include, one, those who directly and actively commit the act constituting the crime or, two, those who aid and abet the commission of the crime. [¶] A person aids

5

and abets the commission of a crime when he or she, one, with knowledge of the unlawful purpose of the perpetrator and, two, with the intent or purpose of permitting, facilitating the commission of a crime, or three, by act or advice, aids, promotes, encourages or instigates the commission of the crime. [¶] Mere presence at the scene of the crime which does not itself assist the commission of the crime does not amount to aiding and abetting. [¶] Mere knowledge that a crime is being committed and the failure to prevent it does not amount to aiding and abetting."

The trial court further instructed the jury, "you are not required to decide what the defendant's exact role was in the killing. As long as each of you is convinced beyond a reasonable doubt that the defendant is guilty of the crime of murder or manslaughter, as will be defined in these instructions, you need not decide unanimously by which theory he is guilty." Echoing this last instruction, the prosecutor stressed to the jury in closing argument that the jury did not have to agree unanimously either that defendant was the direct perpetrator of the killing or an aider and abettor, so long as the jury unanimously found him guilty of unlawful homicide. (*Black, supra*, C041080.)

On the use of a deadly and dangerous weapon, the trial court told the jury, " 'personally used a deadly or dangerous weapon' as used in these instructions, . . . means the defendant must have intentionally displayed a weapon in a menacing manner, intentionally fired it or intentionally struck or hit a human being with it."

In 2022, defendant filed a petition for resentencing pursuant to section 1172.6. The petition was a preprinted form declaration with checked boxes. The petition alleged that a criminal complaint was filed against him that allowed the prosecution to proceed under a theory of felony murder, murder under the natural and probable consequences doctrine, or other theory under which malice was imputed to a person solely based on their participation in the crime; that he was convicted of murder; and that he could not presently be convicted of attempted murder because of changes made to sections 188 and 189 effective January 1, 2019.

6

The prosecution submitted approximately 80 selected pages of the trial transcript, the jury instructions, and the jury's verdict. Based on this submission, the prosecution argued "the facts of the case and the instructions given required that the jury, at a minimum, find that [defendant] aided and abetted the killing of [A.D.] and acted with implied malice."

The trial court issued a written ruling denying the petition. The trial court wrote, "The defendant . . . was the sole individual charged in the information in Count 1 with a violation of Penal Code sec. 187(a), and the jury was instructed on First Degree Murder, Second Degree Murder, and both Voluntary and Involuntary Manslaughter. As to [C]ount 1, there was a special allegation pursuant to Penal Code sec. 12022(b)(l), personal use of a deadly or dangerous weapon. Also, he was charged in Count 3 with a violation of Penal Code sec. 187(a)(5) Conspiracy to Pervert or Obstruct Justice. . . . [¶] While Ms. Westfall was with [defendant] inside the home of [A.D.] when [A.D.] was killed, it appears clear that she was not the actual killer, and to the extent she was involved it was minimal and more related to Count 3. It appears clear from the evidence that [defendant] was the actual and sole killer of [A.D.] As such, he is not entitled to relief pursuant to Penal Code sec. 1170.95(c), and fails to make a prima facie showing relief. See *People v. Gallo* (2020) 57 Cal.App.5th 594, holding that a petitioner for resentencing pursuant to Penal Code sec. 1170.95(c), who is the sole killer, is not entitled to relief under 1170.95 even though conviction is based on the doctrine of natural and probable consequences."

Defendant filed a timely notice of appeal.

## DISCUSSION

Defendant argues the trial court engaged in impermissible fact finding when it concluded he was the actual killer in this case and ineligible for resentencing under section 1172.6. The People respond with facts excerpted from some of the testimony

7

offered at trial to bolster the factual findings made by the trial court. We agree with defendant.

Effective January 1, 2019, Senate Bill No. 1437 (2017-2018 Reg. Sess.) was enacted "to amend the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (Stats. 2018, ch. 1015, § 1, subd. (f).)

Senate Bill No. 1437 "amended the natural and probable consequences doctrine by adding subdivision (a)(3) to section 188, which states that '[m]alice shall not be imputed to a person based solely on his or her participation in a crime.' (§ 188, subd. (a)(3), added by Stats. 2018, ch. 1015, § 2.)" (*People v. Harden* (2022) 81 Cal.App.5th 45, 51.) This language eliminated the use of the natural and probable consequences doctrine in murder prosecutions. (*People v. Gentile* (2020) 10 Cal.5th 830, 846.)

Senate Bill No. 775 expanded the scope of those changes to encompass, among other things, murder convictions "under the natural and probable consequences doctrine or other theory under which malice is imputed to a person based solely on that person's participation in a crime." (§ 1170.95, subd. (a), as amended by Stats. 2021, ch. 551, § 2.)

Section 1172.6 creates a petition process for an eligible defendant to seek to be resentenced. (§ 1172.6, subd. (a).) Section 1172.6, subdivisions (b) and (c) create the process for evaluating the petition. (*People v. Lewis* (2021) 11 Cal.5th 952, 960-962.) First, the trial court must determine whether the petition is facially sufficient under section 1172.6, subdivision (b). (*Id.,* at p. 960.) If the petition is facially sufficient, the court must appoint counsel (if requested) and follow the briefing schedule set forth in the statute. (*Id.* at p. 966.) Following the completion of this briefing, the trial court must hold a hearing to determine whether the petition has made a prima facie showing that the petitioner is entitled to relief. (*Ibid.*; § 1172.6, subd. (c).)

8

As our Supreme Court explained, "[w]hile the trial court may look at the record of conviction after the appointment of counsel to determine whether a petitioner has made a prima facie case for section [1172.6] relief, the prima facie inquiry under subdivision (c) is limited. Like the analogous prima facie inquiry in habeas corpus proceedings, ' "the court takes petitioner's factual allegations as true and makes a preliminary assessment regarding whether the petitioner would be entitled to relief if his or her factual allegations were proved. If so, the court must issue an order to show cause." ' [Citations.] '[A] court should not reject the petitioner's factual allegations on credibility grounds without first conducting an evidentiary hearing.' [Citations.] 'However, if the record, including the court's own documents, "contain[s] facts refuting the allegations made in the petition," then "the court is justified in making a credibility determination adverse to the petitioner." ' " (*People v. Lewis, supra*, 11 Cal.5th at p. 971.) Stated another way, a petition for resentencing may be denied at the prima facie stage where the record of conviction, including items such as the jury instructions and associated findings, establish a defendant's ineligibility for relief as a matter of law. (*People v. Curiel* (2023) 15 Cal.5th 433, 459-461.)

In *People v. Langi* (2022) 73 Cal.App.5th 972, 976, the defendant was one of three men who punched the victim who ultimately died after a punch caused him to fall and hit his head. In examining whether the defendant was ineligible for relief under 1172.6 as a matter of law, the appellate court focused on two instructions (the same ones given in this case) on the concepts of second degree murder and aiding and abetting. (*Id.* at p. 981.) The court concluded, the aiding and abetting instruction was "ill suited to the crime of second degree murder. If, as here, a trial court uses such an instruction without tailoring it to the specifics of that crime, the instruction creates an ambiguity under which the jury may find the defendant guilty of aiding and abetting second degree murder without finding that he personally acted with malice." (*Id.* at p. 982, fn. omitted.) The *Langi* court continued, "The aiding-and-abetting instruction stated that a person aids and abets a

9

crime if he or she acts 'with knowledge of the unlawful purpose of the perpetrator, and . . . with the intent or purpose of committing or encouraging or facilitating the commission of the crime.' [Citation.] However, as noted above, the second degree murder instruction specified that the direct perpetrator of that crime need not act with the unlawful intent of causing death. Thus, while the perpetrator must have deliberately performed the fatal act 'with knowledge of the danger to, and with conscious disregard for, human life' [citation], his purpose may have been only to strike or to injure, or conceivably only to embarrass, the victim. . . . Thus, under the instructions that were given, the jury was entitled to conclude that, to be guilty as an aider and abettor of second degree murder, appellant need only have intended to encourage the perpetrator's intentional act--in this case, punching [the victim]--whether or not appellant intended to aid or encourage [the victim's] killing, and whether or not he personally knew of and disregarded the risk of such a killing." (*Ibid.,* italics removed, fn. omitted.) As a result, "the record of conviction does not conclusively negate the possibility that the jury found appellant guilty of second degree murder by imputing to him the implied malice of the actual killer, without finding that he personally acted 'with knowledge of the danger to, and with conscious disregard for, human life' (CALJIC No. 8.31), an evidentiary hearing is required." (*Id.* at p. 984.)

Here, the same result follows. The trial court's instructions tracked those given in *Langi* and carry with them the same fatal flaw at this prima facie stage. The trial court's instructions informed the jury it could convict defendant based an actual killer theory or on an aiding and abetting theory. As a result, this record of conviction does not foreclose the possibility the jury found defendant was guilty as aider or abettor based upon a finding that defendant shared the direct perpetrator's (perhaps Westfall) murderous intent or that defendant knew the direct perpetrator's act was dangerous to human life and defendant acted in conscious disregard for human life. These instructions thus permitted the jury to find defendant guilty of murder as an aider and abettor without a finding that

10

defendant personally acted with malice. Because the record of conviction does not conclusively establish that defendant was convicted of murder under a theory that remains viable under current law, he is not ineligible for relief as a matter of law.

Given that the jury had two paths by which it could convict defendant of murder, the question becomes whether the trial court, at the prima facie stage, could resolve the question of whether defendant was the actual killer or an aider and abettor on this record without engaging in the fact finding expressly forbidden by *Lewis*. (*People v. Lewis, supra,* 11 Cal.5th at p. 971.) We conclude it could not. Nothing in the record of conviction establishes defendant was the actual killer as a matter of law. To reach this conclusion, the trial court had to pick and choose from the excerpts presented to it by the prosecution to find defendant was the actual killer. While an examination of the evidence at an evidentiary hearing (which is permitted) may reveal defendant was the actual killer as opposed to an accomplice, *Lewis* instructs us that this type of fact finding and weighing evidence has no place in the prima facie determination of defendant's eligibility for relief under section 1172.6 at the prima facie stage. (*Lewis,* at p. 971.) This is all the more true given the partial record presented to the trial court (a selection of 80 pages from the full transcript of over 2,000 pages). Even in those excerpts, there is testimony that Westfall also kicked and hit defendant during the relevant assault. Resolving who was the actual killer in this context is the quintessential essence of fact finding.

The People counter that the jury's finding defendant used a deadly weapon means the jury found defendant "was the actual killer," and it "demolishes the possibility 'that the jury found appellant guilty of second-degree murder by imputing to him the implied malice of the actual killer, without finding that he personally acted "with knowledge of the danger to, and with conscious disregard for, human life" . . . .' "

A "finding of personal use [of a weapon]," however, "[does] not in itself prove [a] defendant was the actual killer" or perpetrator. (*People v. Jones* (2003) 30 Cal.4th 1084, 1120.) For instance, "[i]f two robbers display guns to intimidate robbery victims and one

11

shoots and kills a victim, both robbers could be found to have personally used a gun in the robbery and the felony murder, even though only one is the actual killer." (*Ibid.*) Consistent with those statutes, the trial court instructed the jury that " 'personally used a deadly or dangerous weapon' as used in these instructions, . . . means the defendant must have intentionally displayed a weapon in a menacing manner, intentionally fired it or intentionally struck or hit a human being with it." Contrary to the People's argument, this enhancement adds nothing to the calculus here.

## DISPOSITION

The order denying the petition under section 1172.6 is reversed and the matter is remanded to the trial court for an evidentiary hearing.

/s/

HULL, Acting P. J.

We concur:

/s/

ROBIE, J.

/s/

MESIWALA, J.

12