[No. B062850. Second Dist., Div. One. May 5, 1992.]

THANG QUY TU, Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
THE PEOPLE, Real Party in Interest.

COUNSEL

Wilbur F. Littlefield, Public Defender, Laurence M. Sarnoff, Laura Green, Douglas J. Goldstein and Albert J. Menaster, Deputy Public Defenders, for Petitioner.

No appearance for Respondent.

Ira Reiner, District Attorney, Donald J. Kaplan and Eugene D. Tavris, Deputy District Attorneys, for Real Party in Interest.

OPINION

VOGEL, J.—The issue before us is whether hearsay testimony presented at the preliminary hearing in this case comports with the standards announced in *Whitman* v. *Superior Court* (1991) 54 Cal.3d 1063 [2 Cal.Rptr.2d 160, 820 P.2d 262]. We hold that it does not.

FACTS

Thang Quy Tu was charged with two counts of first degree murder with the use of a firearm and multiple-murder special circumstances were alleged. (Pen. Code, § 190.2, subd. (a)(3).)[1] Two police officers, John Wong and Rick Peterson, testified at Tu's preliminary hearing. The primary investigating officer, Detective Larry Martinez, was in Mexico and did not testify.

Wong testified that on or about December 24, 1990, he talked to Martinez about a double homicide that had occurred a day or two earlier. Martinez told Wong that the victims were a male Asian and a female Asian and that the suspect was a male Asian.

On December 29, 1990, Wong acted as translator for a percipient witness, Puo Piu So. Wong presented a photo lineup to So, explaining the process in English and in Cantonese. So identified Tu, stating that Tu's picture "looks like the person who did the shooting. I saw him before when he brought in his children. I think I saw him in here approximately two to three times." Martinez was present at the time Wong interviewed So. Wong later interviewed a second person but did not remember that person's name—notwithstanding that the unnamed person had also been shown the photo lineup and

---

[1]Unless otherwise stated, all section references are to the Penal Code.

Under section 190.2, subdivision (a)(3), one murder must be in the first degree and the other in the first or second degree. (*People* v. *Mattson* (1990) 50 Cal.3d 826, 875 [268 Cal.Rptr. 802, 789 P.2d 983].)

"possibly" had made an identification. As Wong explained, he did not take notes and he was not familiar with any report that might have been made because he "wasn't [the] lead investigating officer. [He] was basically there to do the translation, so [he did not] remember all the parts of the whole case." Wong explained that So had greeted Martinez as though they had talked on an earlier occasion and that So looked at the pictures for only a minute or two before making an identification.[2]

Peterson, "one of the investigating officers," was Martinez's partner and Martinez "briefed [him] on the entire case." "Basically, [Martinez] said . . . there was a double homicide that occurred on two separate locations on the street. They died of multiple gunshot wounds. Recovered evidence, various casings, bullets from the scene, crime scene. . . . Talked to several witnesses that observed the incident. Just briefed me just on everything that he had done up to that point."

Martinez told Peterson that one homicide (Mang Keng Lou, a male, who died at the scene from multiple gunshot wounds) occurred at 4610-A Valley Boulevard at about 2:40 p.m. and the other (Dang Anh Le, who was Tu's wife and who later died during surgery, also from a gunshot wound) occurred just minutes before,[3] at 4580-C Valley Boulevard. Both addresses were commercial type buildings and they were located about 100 to 150 feet from each other. According to Peterson, the police learned about the shootings from a telephone call placed to 911 by Le (the female victim). Martinez had talked to the 911 operator, Terin Fitzgerald, who had talked to the victim. Peterson testified that Fitzgerald told Martinez that the victim had made several statements but Peterson did not remember the content of those statements.

Pursuant to a search warrant issued sometime after the homicides, Peterson recovered an expended casing at Le's residence and he was present when a bullet was recovered there. Martinez told Peterson that he had interviewed Le's three children and that the oldest said she had seen her father (Tu) with a gun and that, approximately a week before the shootings, Tu fired a few shots inside the residence. The children also told Martinez (who told Peterson) that Tu and his wife were arguing a lot and having family problems. Some unidentified person told Martinez (who told Peterson) that Tu was not

---

[2]The photo lineup card indicates the place of So's interview as "4610," which Wong said was So's "place of business." As will appear, however, it is only by reference to inadmissible hearsay that we know one of the homicides occurred at 4610-A Valley Boulevard. Even with multiple hearsay, we cannot determine whether So saw one or both homicides.

[3]On cross-examination, Peterson explained that he had "no idea" where Martinez got his information about the length of time separating the shootings, but simply assumed he got it from interviews with witnesses and people at the scene and the responding patrol units.

living with Le at the time of the homicides. Martinez also told Peterson that the oldest child had said that Tu told his children that he was going to kill their mother.[4]

Peterson testified that a police department firearms expert told him that the bullet found at Le's residence was "possibly" fired from the same gun as the bullets found at 4610-A and 4580-C Valley Boulevard. The casing found at Le's residence was fired from the same gun as the casings found at the scenes of the homicides.

Based on this evidence, the magistrate held Tu to answer for both murders. Tu was arraigned in superior court and his motion to dismiss (§ 995) was denied. We denied Tu's petition for a writ of mandate but the Supreme Court granted his petition for review and transferred the matter back to us with directions to issue an alternative writ and to consider this matter in light of *Whitman* v. *Superior Court, supra,* 54 Cal.3d 1063.

## DISCUSSION

Proposition 115, the "Crime Victims Justice Reform Act," added subdivision (b) to section 30 of article I of the California Constitution to make hearsay evidence admissible at preliminary hearings and amended subdivision (b) of section 872 to provide that a probable cause determination at a preliminary hearing may be based on hearsay statements related by a police officer with specified qualifications and experience.[5]

As interpreted by our Supreme Court in *Whitman* v. *Superior Court, supra,* 54 Cal.3d at pages 1072-1074, Proposition 115 does not permit a designated "reader" who has no personal knowledge about the case to testify at a preliminary hearing. To "allow testimony by noninvestigating officers or readers would seemingly sanction a form of double or multiple hearsay

---

[4]On cross-examination, Peterson explained that he had numerous conversations with Martinez and that he did not mean to suggest he was using the exact words Martinez used. "He just gave me the general idea what the conversation consisted of which was that the girl informed Detective Martinez that her father said that he was going to kill their mother." Peterson has never met any of the children and their ages were never stated. We do not know if the oldest child was 2 or 10 or 20.

[5]Subdivision (b) of section 872 provides that, "[n]otwithstanding Section 1200 of the Evidence Code [the hearsay rule], the finding of probable cause may be based in whole or in part upon the sworn testimony of a law enforcement officer relating the statements of declarants made out of court offered for the truth of the matter asserted. Any law enforcement officer testifying as to hearsay statements shall either have five years of law enforcement experience or have completed a training course certified by the Commission on Peace Officer Standards and Training which includes training in the investigation and reporting of cases and testifying at preliminary hearings."

beyond the contemplation of the framers of, and voters for, Proposition 115. . . . [W]e doubt that Proposition 115 was intended to sanction a procedure whereby a noninvestigating officer, lacking any personal knowledge of the matter, nonetheless would be permitted to relate not only what the investigating officer told him, but also what the other witnesses told the investigating officer. It is noteworthy that although Proposition 115 created an exception to the basic hearsay rule . . . . , the measure did not purport to create a similar exception for the multiple hearsay rule . . . ." (*Id.* at p. 1074.)

By prohibiting the use of readers and multiple hearsay, the Supreme Court avoided constitutional questions about the reliability of the evidence and the defendant's inability to "meaningfully cross-examine the testifying officer regarding the circumstances under which the out-of-court statement was made." (54 Cal.3d at p. 1074.) ■ Under *Whitman*, therefore, Proposition 115 creates a new exception to the hearsay rule which allows a qualified investigating officer to testify about otherwise inadmissible hearsay statements made to *him* by persons *he* has interviewed. But Proposition 115 does *not* authorize the use of double or multiple hearsay statements and such testimony is admissible only if it qualifies under some other exception to the hearsay rule. (See also *Montez* v. *Superior Court* (1992) 4 Cal.App.4th 577 [5 Cal.Rptr.2d 723]; *People* v. *Wimberly, ante,* p. 439 [6 Cal.Rptr.2d 800]; *Shannon* v. *Superior Court, ante,* p. 676 [7 Cal.Rptr.2d 47].)

■ If we eliminate from the statement of facts set out above all information provided by Wong and Peterson by way of inadmissible double or multiple hearsay, this is what we have left:

On or about December 24, 1990, Wong talked to Martinez about a double homicide that had occurred a day or two earlier. Wong served as translator for a percipient witness, Puo Piu So, at So's place of business, a location described as "4610." A photo lineup was presented to So and Wong explained the process in English and Cantonese. So identified Tu, stating that Tu's picture "looks like the person who did the shooting. I saw him before when he brought in his children. I think I saw him in here approximately two to three times."[6] In addition to the identification of Tu by So, Wong also spoke to someone else who had been shown the photo lineup and "possibly" had made an identification—of whom we do not know.

---

[6]We don't know whether So saw one or both shootings or where he was located at the time of the shootings. Without resort to hearsay, we don't know where either homicide occurred or whether they occurred at the same location.

Peterson, "one of the investigating officers," was Martinez's partner and Martinez "briefed [him] on the entire case."[7] Pursuant to a search warrant issued sometime after the homicides, Peterson recovered an expended casing at the residence of the female victim and Peterson was present when a bullet was recovered there.

Everything else is double or multiple hearsay—Martinez collected statements from witnesses and experts and other police officers and passed on that information to Wong and Peterson. With the exception of Wong's vague recollection about So's identification of Tu, Tu's lawyer was unable to cross-examine the witnesses about the declarants. Of equal importance is the fact that, without the missing information, we don't know that the female victim was Tu's wife, or where the killings occurred, or about the statements Tu allegedly made to his children,[8] or about the connection of the bullet and casing found at Le's residence to those found at the other locations. And even with the multiple hearsay, we haven't a clue about the relationship of the one victim to the other, or about facts that would make either homicide first degree murder,[9] or about what the female victim said to the 911 operator, or about whether So saw one or both shootings.

As the trial court stated before it was led astray by the prosecutor's persuasive but erroneous argument, So "might as well have been [talking] about some shooting that happened in Chicago. There is really nothing to tie

---

[7]Although Peterson described himself as "one of the investigating officers," the record shows only that he searched Le's residence, visited 4580-C Valley Boulevard, talked to Martinez and talked to the firearms expert. Except as to his search of Le's residence, Peterson was not the "investigating officer" within the meaning of *Whitman*. He had neither sufficient knowledge of the crime nor of the circumstances under which any out-of-court statement was made to permit meaningful assistance to the magistrate in assessing the reliability of the statements. (*Shannon* v. *Superior Court, supra, ante,* p. 676.) Under these circumstances, Peterson's hearsay testimony about what Martinez told him is inadmissible under even the most generous interpretation of *Whitman*. (See *People* v. *Retamoza* (1992) 3 Cal.App.4th 1304 [5 Cal.Rptr.2d 137].)

[8]Although Tu's statement to his children that he was going to kill their mother is clearly an admission (Evid. Code, § 1220), that doesn't make it admissible here—because Martinez's statements to Peterson are inadmissible under *Whitman* and its progeny. The admission exception to the hearsay rule would be relevant if Martinez testified that the child told him what Tu had said; in that event, the Proposition 115 exception would cover the child's statement to Martinez and the admission exception would cover Tu's statement to his child. The missing exception in the case before us is one to cover Martinez's statements to Peterson.

[9]The multiple-murder special-circumstance allegation compounds the problem. To support this allegation, the evidence must be sufficient to support a finding of probable cause to believe the defendant committed at least one first degree murder and another murder in the first or second degree. (§ 190.2, subd. (a)(3); (*People* v. *Williams* (1988) 44 Cal.3d 883, 925 [245 Cal.Rptr. 336, 751 P.2d 395].) Without resort to inadmissible evidence, the record is silent on the subject of premeditation or any other fact elevating either homicide to murder in the first degree (§ 189).

that to this by reading the transcript."[10] And although the deputy district attorney stated at the hearing on the motion to dismiss that the male victim was shot nine times, there is no evidence at all in the preliminary hearing transcript about how many times either victim was shot.[11]

This is not enough to hold Tu to answer because there is not sufficient cause to believe that Tu is guilty of either homicide. (§ 872, subd. (a); *People v. Slaughter* (1984) 35 Cal.3d 629, 637 [200 Cal.Rptr. 448, 677 P.2d 854].) It is not enough that we know a crime was committed because the evidence is wholly insufficient to connect Tu to one or both crimes. The most we know without resort to multiple hearsay is that Tu looks like the person who shot somebody, somewhere. That is not enough.

## DISPOSITION

Because the magistrate's finding of probable cause in this case was based on the improper and unauthorized use of multiple hearsay, we conclude that the superior court should have granted Tu's motion to set aside the information under section 995. Accordingly, we direct the clerk to issue a writ of mandate compelling the superior court to vacate its prior order and to enter a new order granting Tu's motion to set aside the information.

Spencer, P. J., and Ortega, J., concurred.

---

[10]The deputy district attorney persuaded the trial court to infer from the "4610" inscription on the photo lineup card that Wong had interviewed So at the location of the shooting. In light of the fact that So was interviewed about a week after the shooting at a location described by Wong only as So's place of business, we find no rational basis for such an inference. The fact that So said Tu had been to So's place of business "two or three times" does not have anything to do with the location of the shooting.

[11]There were five exhibits at the preliminary hearing. Exhibits 4 and 5 were the photo lineup card and photo display folder. According to Peterson's testimony, Martinez told him that Exhibit 1 consisted of one bullet recovered from 4610-A Valley Boulevard and two casings recovered from 4580-C Valley Boulevard. Exhibit 2 consisted of the expended casing and expended bullet recovered by Peterson at Le's residence. Exhibit 3 was a casing recovered by Peterson at 4580-C Valley Boulevard. Assuming without deciding that Peterson's testimony about what the firearms expert told him—that the casings recovered at Le's residence came from the same gun as the casings recovered at 4580-C Valley Boulevard—is not made inadmissible by the hearsay rule, it is nevertheless inadmissible because it is irrelevant. (Evid. Code, § 350.) There is no admissible evidence that a crime occurred at 4580-C Valley Boulevard.