Filed 11/6/25  P. v. Edwards CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | F087684 |
| Plaintiff and Respondent, | (Super. Ct. No. CF81266784) |
| v. | |
| JERRY LYNN EDWARDS, | **OPINION** |
| Defendant and Appellant. | |

## THE COURT[*]

APPEAL from a judgment of the Superior Court of Fresno County.  Kimberly A. Gaab, Judge.

Eric Weaver, under appointment by the Court of Appeal, for Defendant and Appellant.

Office of the State Attorney General, Sacramento, California, for Plaintiff and Respondent.

-ooOoo-

---

[*]        Before Detjen, Acting P. J., Peña, J. and Snauffer, J.

## INTRODUCTION

In 1981, appellant and defendant Jerry Lynn Edwards (appellant) and codefendant Terry Myers were convicted after a joint jury trial in Fresno County Superior Court of first degree murder, armed robbery, and two counts of attempted robbery, with firearm enhancements. They were both sentenced to 25 years to life. In their joint direct appeal, the judgment was affirmed.

In 2022, appellant filed a petition for resentencing of his murder conviction pursuant to Penal Code[1] section 1172.6. The prosecution conceded there was a prima facie case based on the jury instructions, and the trial court set an evidentiary hearing. The parties agreed the reporter's transcript of the jury trial no longer existed and the court could rely on the preliminary hearing transcript for purposes of the evidentiary hearing. In 2024, the court found beyond a reasonable doubt that appellant was convicted as the actual killer; the court additionally found beyond a reasonable doubt that he was a major participant in the underlying felony who acted with reckless indifference to human life.

On appeal, appellate counsel filed a brief that summarized the facts with citations to the record, raised no issues, and asked this court to independently review the record. (*People v. Wende* (1979) 25 Cal.3d 436.) We affirm.

## PROCEDURAL BACKGROUND

On or about February 27, 1981, a felony complaint was filed that charged appellant and codefendants Myers, David Potts, and Anthony Canady with committing the following offenses on or about February 24, 1981: count 1, murder of Arthur Pena, Jr. (§ 187), with enhancements that appellant personally used a firearm (§ 12022.5) and the three codefendants were armed with a firearm (§ 12022, subd. (a)); and count 2, robbery of Gilbert Gama (§ 211), with enhancements that all four defendants were armed with a firearm (§ 12022, subd. (a)).

---

[1] All further citations are to the Penal Code.

2.

Codefendant Canady was dismissed from the complaint and given immunity from prosecution in exchange for his testimony.

## PRELIMINARY HEARING EVIDENCE[2]

On the evening of February 24, 1981, appellant was at the pool hall with his friends Myers, Potts, Canady, Andrew Newsome and his brother Luther Parnell Newsome,[3] Packard, and other men and women. Later that night, appellant and the rest of his group left the pool hall and walked toward Packard's nearby apartment, while Andrew and Luther each rode on a bicycle.

On the same evening, Gama drove from Kingsburg with his friends Pena, Adrian Guerra, Rick Maldonado, Crabtree, and Teresa Marquez to see someone in Fresno.

Sometime between 11:00 p.m. and 11:30 p.m., Gama stopped at the gas station at the corner of Church and Elm Avenues in Fresno, to buy cigarettes and use the payphone. Gama parked behind the gas station near the restrooms.

---

[2]    In the course of the section 1172.6 proceedings, the trial court and parties agreed the preliminary hearing, jury instructions, and nonpublished opinion from appellant's direct appeal existed, the trial transcript no longer existed because of the age of the case, and the court could review the entirety of the preliminary hearing transcript for purposes of the section 1172.6 evidentiary hearing.

The preliminary hearing was conducted in April 1981, prior to the enactment of Proposition 115 in 1990, so that hearsay was not admissible at the preliminary hearing unless subject to an exception. (See, e.g., *Tu v. Superior Court* (1992) 5 Cal.App.4th 1617, 1621; *People v. Nguyen* (2025) 109 Cal.App.5th 1133, 1141.) As a result, the prohibition in section 1172.6, subdivision (d)(3), that "hearsay evidence that was admitted in a preliminary hearing pursuant to subdivision (b) of [s]ection 872 shall be excluded from the [evidentiary] hearing as hearsay, unless the evidence is admissible pursuant to another exception to the hearsay rule," is not applicable in this case.

The following factual statement is based on the preliminary hearing testimony of Canady, Gama, Andrew Newsome, Vicky Crabtree, Marie Packard, and Anna Bullock. Detective Don Mitchell testified to certain prior inconsistent statements.

[3]    To avoid confusion, we identify individuals who share the same last name by their first names. No disrespect is intended.

Packard's apartment was located near the gas station. Bullock, one of Packard's friends, was walking with appellant's group. Bullock testified that when their group reached the gas station, she saw a car with "Mexicans" parked near the restroom. Packard said she thought there was going to be trouble at the gas station. Bullock said they should keep walking to Packard's apartment.

Appellant, Myers, and the men stopped at the gas station while Packard and the women continued to her apartment.

## Gama's Encounter in the Store

Gama got out of his car and headed to the gas station convenience store to buy cigarettes. Maldonado went to use the payphone at the corner. Pena got out of the car, but his friends did not see where he went. Crabtree and Marquez stayed in the car.

Gama testified when he entered the store, he encountered four or five African-American men hanging around and "[w]atching what was going on." Gama bought a pack of cigarettes, which cost less than a dollar. He did not have any change and had to open his wallet. Gama had over $700 in his wallet because he had just cashed his income tax refund. He pulled out a $5 or $10 bill, received change, and left the store. Gama believed some of the men in the store could have seen inside his wallet.

Canady testified he saw appellant, Potts, and a third man, possibly Myers, standing together and talking about "[r]obbing the Mexican" in the car parked behind the gas station. Canady also testified he heard one of the men say, in a whisper, " 'Let's get 'em,' " and " 'they got a lot of money.' "

Canady testified he saw the handle of a gun in appellant's pants.

Andrew testified there were about six people in front of the gas station, including appellant, Myers, Potts, and Canady.[4] Andrew heard appellant say something about a robbery, and that he was "[f]ixin' to rob this Mexican."

---

[4] At the preliminary hearing, the prosecutor provided transactional immunity to Andrew.

Andrew testified he saw appellant with a .22 caliber handgun and asked what he was going to do with it. Appellant did not respond.

**The Robbery and Murder**

After Gama bought the cigarettes, he walked to the driver's door of his car. Pena also returned to the car and stood near Gama on the rear driver's side. Crabtree and Marquez remained in the car.

Crabtree testified three to five African-American men followed Gama to the car. Gama got into the driver's seat, handed the cigarettes to Crabtree, and stepped back outside.

An African-American man appeared next to Gama at the driver's door, held a gun to his back, and told him not to move and "to be cool and give me your wallet." Crabtree saw the man hold a pistol to Gama's back.

Gama raised his hands and told the man to go ahead and take his wallet, and the man removed Gama's wallet from his pocket.

Gama and Crabtree testified this same gunman leaned into the car, pointed his gun at Crabtree, and said to turn over her purse. Crabtree said she did not have a purse. The man then asked Marquez for her purse and she did not respond.

Gama and Crabtree testified Pena was still standing toward the rear of the driver's side of the car, and he was confronted by three or four African-American men. Gama saw one of these men pull a gun on Pena. Gama only saw the gun's barrel and could not tell if the weapon was a handgun or something larger. Crabtree testified this man pointed "some sort of rifle" at Pena that was about 14 inches long, and asked for his wallet.

Crabtree testified Pena reached for his wallet but he did not give it to the gunman who was standing in front of him. Instead, Pena pulled off his belt, swung it around, and started fighting and kicking at the men.

5.

Andrew testified he saw several men standing around the car as a man was being robbed. Andrew testified appellant was "tussling" and wrestling with a man, while a second man was fighting someone else.

Andrew heard someone say, " 'Shoot, shoot, shoot him.' " A few seconds later, Andrew heard a single gunshot. The shooting victim was the man who was standing at the rear of the car and had been "tussling" with appellant. The victim fell down and Andrew saw blood.

Andrew testified that immediately after he heard the gunshot, he saw appellant holding a .22 caliber gun. Appellant and the robbery suspects ran away after the gunshot was fired.

Pena was shot one time. He leaned against the car and Gama asked if he was okay. Pena said yes, and then spit up blood and fell to the ground. Gama believed the store clerk called the police. Pena died that night.

At the preliminary hearing, both Gama and Crabtree identified Myers as the man who pulled the gun on Gama, took his wallet, and leaned into the car and asked for the women's purses. Gama testified Myers was not the man who held a gun on Pena.

Gama testified appellant and Potts were two of the men who surrounded Pena, but he could not remember "which one was where." Crabtree believed appellant was standing next to Pena, but she was not sure who shot Pena.

**Packard's Apartment**

Packard testified she had just arrived at her apartment when she heard the gunshot. Shortly afterwards, appellant, Myers, Canady, Andrew, and other men from their group arrived.

Packard testified Canady appeared to be bragging about what occurred. Canady said he argued with a "dude" who hit him from behind with a fist. Canady said that guy had been "playing hero" and Canady said, " 'Shoot him, blam, blam.' "

6.

Canady testified he asked appellant, " 'Who blammed on him? Who blammed on him?' " No one answered.

Andrew testified he talked to appellant at Packard's apartment and asked if he shot the "Mexican." Appellant said, " 'Ah, man, I don't know' you know, like that, I don't know if it was no or yeah, you know." Andrew told appellant that he would go to jail if he did. Appellant did not respond.

Packard testified appellant was her boyfriend. Packard and appellant talked in her bedroom after the shooting, and no one else was present. Appellant told Packard that "he shot the dude" and it was "[o]ver a fight." Appellant said the guy "tried to be a hero and had grabbed … Canady."

Packard testified the police subsequently found a .410 sawed-off shotgun under her mattress; she had never seen the gun before. The police also found shells, and Packard claimed she kept them in her apartment.

Detective Don Mitchell testified he interviewed Packard, and she said Canady arrived at her apartment after the incident at the gas station, Canady said they had a fight with a "Mexican" male, one of the victims tried to hit Canady, that same man tried to play a " [']a hero['] and that [appellant] had shot the guy." Packard said Canady appeared to be bragging about what happened.

## TRIAL AND CONVICTIONS

At the conclusion of the preliminary hearing, the trial court held appellant, Myers, and Potts to answer on the charged offenses, and found the evidence further supported the prosecution's motion to add two counts of attempted robbery.

On April 21, 1981, the information was filed charging appellant and codefendants Myers and Potts with count 1, murder of Pena (§ 187), and that appellant personally used a firearm (§ 12022.5), and the other defendants were armed with a firearm (§ 12022, subd. (a)); and count 2, robbery of Gama (§ 211), and that Myers

7.

personally used a firearm (§ 12022.5) and the other defendants were armed with a firearm (§ 12022, subd. (a)).

In counts 3 and 4, all defendants were charged with the attempted robberies of, respectively, Crabtree and Marquez (§§ 664/211), and that Myers personally used a firearm (§ 12022.5).

Prior to trial, the district attorney dismissed the charges against codefendant Potts.

In June and July 1981, Judge Pettitt presided over the joint jury trial for appellant and Myers. As previously explained, the trial transcript no longer exists.

The jury was instructed on principals, aiding and abetting, and accomplices. As to the charged offenses, the jury was instructed on murder, malice, first degree felony murder, aiding and abetting, and second degree murder; voluntary manslaughter as a lesser included offense of murder; and attempt and robbery.

As to the enhancements, the jury was instructed with CALJIC No. 17.19, that if it found appellant guilty in count 1 of murder or the lesser offense of voluntary manslaughter, it had to determine whether appellant "personally used a firearm during the commission of the crime charged," and that " 'used a firearm' " meant "to display a firearm in a menacing manner, intentionally to fire it, or intentionally to strike or hit a human being with it." The instruction further stated that if the jury convicted Myers of counts 2, 3, or 4, it had to determine whether he personally used a firearm in the commission of the offenses.

The jury also received CALJIC No. 17.15, that if the jury convicted codefendant Myers in count 1 of murder or the lesser included offense of voluntary manslaughter, it had to determine whether Myers was a principal and armed with a firearm, which meant he knowingly carried it as a means of offense or defense. This instruction also stated that if the jury convicted appellant of count 2, it had to determine whether he was a principal and armed with a firearm.

8.

On July 3, 1981, the jury found both appellant and Myers guilty of count 1, first degree murder of Pena, and that appellant personally used a firearm and Myers was armed with a firearm; count 2, robbery of Gama, and that Myers personally used a firearm and appellant was armed with a firearm; and counts 3 and 4, the attempted robberies of Crabtree and Marquez, and that Myers personally used a firearm in both offenses.

On August 4, 1981, the trial court denied motions for new trial, and sentenced appellant to 25 years to life for count 1, murder, plus two years for personal use of a firearm, with concurrent sentences for the other offenses and enhancements.

The trial court sentenced codefendant Myers to 25 years to life for count 1, murder, plus one year for being armed with a firearm, with concurrent and stayed sentences for the other offenses and enhancements.

**Direct Appeal**

In 1984, this court filed the nonpublished opinion in the joint appeal from appellant and Myers, rejected their evidentiary and instructional arguments, and prosecutorial misconduct and ineffective assistance of counsel claims, and affirmed the judgments. *People v. Edwards et al.* (May 7, 1984) 5 Crim. 5771 [nonpub. opn.].)

**SECTION 1172.6 PETITION**

On November 14, 2022, appellant filed a petition for resentencing of his first degree murder conviction pursuant to section 1172.6.[5]  The trial court appointed counsel.

On November 30, 2023, the prosecutor conceded there was a prima facie case based on the instructions.  The trial court agreed the jury was instructed on aiding and abetting and accomplices, and appellant met his burden to show a prima facie case.  The

---

[5]     The instant record contains a minute order stating that appellant filed the petition on that date but the petition is not included.

court issued an order to show cause and set an evidentiary hearing, and the parties agreed the court could rely on the preliminary hearing transcript to make its findings.

**The Parties' Briefs for the Evidentiary Hearing**

The prosecution's brief asserted appellant was ineligible for resentencing because the preliminary hearing evidence showed he was the actual killer of Pena, and a major participant and acted with reckless indifference to human life, based on the testimony of Canady, Andrew, Gama, and Packard, that he planned and organized the robbery, he was seen with a gun before and after the shooting, and he admitted shooting Pena.

In his brief, appellant argued the preliminary hearing evidence was inconclusive about who shot and killed Pena, and insufficient to prove beyond a reasonable doubt that he was the actual killer. Canady's testimony could not be relied on since he was an accomplice and his testimony was not corroborated, Andrew testified under a grant of immunity, and the other witnesses gave inconsistent testimony.

**Evidentiary Hearing**

On January 19, 2024, the trial court convened the evidentiary hearing. The court and parties agreed the trial transcript had been destroyed, the parties stated the arguments in their hearing briefs, and they submitted the matter on the entirety of the preliminary hearing transcript. The court took the matter under submission to review the preliminary hearing transcript.

**The Trial Court's Denial of Appellant's Petition**

On February 1, 2024, Judge Gaab filed an order after the evidentiary hearing and denied appellant's petition based on the following facts from the preliminary hearing transcript:

> "On February 24, 1981, between 11:00 p.m. and 11:30 p.m., [appellant] was with … Canady, … Myers, … Potts, Luther … , and Andrew … at the [gas station]. Canady testified that [appellant] and Potts discussed robbing individuals who were in a car at the back of the [gas

10.

station], and [appellant] had a gun in his pants. Someone in the group said, 'Let's get them, they got a whole lot of money.'

"Gama testified that he was robbed of his wallet at gunpoint and that the individual who robbed him also demanded the purses from the two females who were inside the car. Gama further testified that, at the same time he was being robbed, a second individual pulled a gun on the decedent, … Pena. Gama recounted that he saw two individuals with guns—the person who robbed him and the person who was facing Pena.… Crabtree, in turn, testified that the same individual who robbed Gama at gunpoint demanded her purse, as well as the purse of the other woman in the car. Crabtree also testified that there were two robbers with guns and that the one standing by Pena had a rifle-type weapon pointed at him.

"Andrew … testified that he knew a robbery was going on when Pena was shot because he heard [appellant] say, 'rob these Mexicans.' In addition, [appellant] was talking about the robbery before arriving at the station, and [appellant] said he was '[f]ixing to rob this Mexican.' Andrew … also testified that he saw a Mexican getting rob[bed] at the back of the car and that [appellant] was tussling and fighting with this individual. He further testified that he saw this individual shot and that, after he was shot, he saw a gun in [appellant]'s hand, a .22 caliber gun which he recognized from its appearance and by the sound of the gunshot. Andrew … confirmed that he did not see anyone else other than [appellant] with a gun at the time the individual was shot. He also testified that, when the tussling ended, he heard a gunshot, saw the individual fall to the ground, and saw [appellant] standing up. Decedent Pena was the only one shot in the robbery.

"Packard, [appellant]'s girlfriend, testified that she heard one gunshot from the [gas station] as she was entering her apartment and that [appellant] and others arrived at the apartment thereafter. While [appellant] and Packard were alone in the bedroom, [appellant] admitted to Packard that 'he shot the dude,' '[o]ver a fight.' "

The trial court found appellant was not convicted based on the felony-murder rule, the natural and probable consequences doctrine, or any other theory of imputed malice that was now invalid. The court further found that the evidence presented at the preliminary hearing proved beyond a reasonable doubt that appellant was the actual

killer. "The testimony of multiple witnesses placed [appellant] in an altercation with Pena, with a firearm, attempting to rob him, at the time he was shot."**6**

The trial court also found beyond a reasonable doubt that appellant was a major participant in the underlying felony who acted with reckless indifference to human life. Appellant was involved in the plan to rob the victims, he initiated the robbery, he was armed with a loaded firearm, he possessed the gun while "tussling and fighting with Pena," he was present during the entire fatal encounter, and he fled the scene instead of rendering aid to the victim.

On February 28, 2024, appellant filed a timely notice of appeal.

## DISCUSSION

As noted above, appellate counsel filed a *Wende* brief with this court. Attached to the brief was appellate counsel's declaration that counsel advised appellant that the *Wende* brief was being filed on his behalf, and he had the right to submit a supplemental brief. This court issued its letter to appellant inviting him to file a supplemental brief. This court's letter was returned as undeliverable.

Both appellant's counsel from the section 1172.6 proceedings and counsel on appeal advised this court that appellant had been released on parole and they did not have a current address. After additional attempts, the *Wende* letters were again returned as undeliverable. We thus conduct an independent review pursuant to *Wende*.

---

**6** The trial court also relied on the jury's finding as to count 1, murder, that appellant personally used a firearm (§ 12022.5), while Myers was found to be armed with a firearm (§ 12022, subd. (a)). The jury's section 12022.5 finding would not have been conclusive by itself since a firearm may be "use[d]" in a variety of ways by a participant in offenses in which a killing results. (§ 12022.5, subd. (a); *People v. Jones* (2003) 30 Cal.4th 1084, 1120; *People v. Young* (2005) 34 Cal.4th 1149, 1205; *People v. Garrison* (2021) 73 Cal.App.5th 735, 743–744.)

## I.  Section 1172.6

Senate Bill No. 1437 (2017–2018 Reg. Sess.) "significantly narrowed the scope of the felony-murder rule" and "created a path to relief for defendants who had previously been convicted of murder on a felony-murder theory but who could not have been convicted under the new law.  Resentencing is available under [section 1172.6] if the defendant neither killed nor intended to kill and was not 'a major participant in the underlying felony [who] acted with reckless indifference to human life, as described in subdivision (d) of … [s]ection 190.2.' " (*People v. Strong* (2022) 13 Cal.5th 698, 703.)

Under section 1172.6, a person who was convicted of murder, attempted murder, or voluntary manslaughter under the prior law may file a petition "to have the [appellant's] murder, attempted murder, or manslaughter conviction vacated and to be resentenced on any remaining counts ...." (§ 1172.6, subd. (a).)

"If the [appellant] makes a prima facie showing that [he or she] is entitled to relief, the court shall issue an order to show cause" (§ 1172.6, subd. (c)) and "shall hold a hearing to determine whether to vacate the murder, attempted murder, or manslaughter conviction and to recall the sentence and resentence the [appellant] ...." (§1172.6, subd. (d)(1).)

"At the [evidentiary] hearing to determine whether the [appellant] is entitled to relief, the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the [appellant] is guilty of murder or attempted murder under California law as amended by the changes to [s]ection 188 or 189 made effective January 1, 2019." (§ 1172.6, subd. (d)(3).)

At the evidentiary hearing, the trial court acts as an independent fact finding in determining whether the People have met their burden. (*People v. Vargas* (2022) 84 Cal.App.5th 943, 952.)

We review the trial court's ruling at the evidentiary hearing for substantial evidence. (*People v. Davis* (2024) 107 Cal.App.5th 500, 509 (*Davis*).)  "This means

'[w]e " 'examine the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value that would support a rational trier of fact in finding [the defendant guilty] beyond a reasonable doubt.' " [Citation.] Our job on review is different from the trial judge's job in deciding the petition. While the trial judge must review all the relevant evidence, evaluate and resolve contradictions, and make determinations as to credibility, all under the reasonable doubt standard, our job is to determine whether there is any substantial evidence, contradicted or uncontradicted, to support a rational fact finder's findings beyond a reasonable doubt.' " (*Id*. at p. 509.)

" ' "Conflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.] We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence. [Citation.]" [Citation.] A reversal for insufficient evidence "is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support' " the [fact finder]'s verdict.' [Citation.] [¶] ' "Substantial evidence includes circumstantial evidence and any reasonable inferences drawn from that evidence." ' " (*Davis*, *supra*, 107 Cal.App.5th at pp. 509–510.)

## B. Analysis

The trial court's finding at the evidentiary hearing that appellant was the actual killer of Pena is supported by substantial evidence. Appellant, Myers, and their friends were in the gas station convenience store when Gama opened his wallet to purchase the cigarettes, and unintentionally displayed a large amount of cash. Canady testified he saw appellant standing with the other men, possibly including Myers, and they were talking about "[r]obbing the Mexican" in the car parked behind the gas station. Canady heard one of the men say, in a whisper, " 'Let's get 'em,' " and "they got a lot of money."

Andrew heard appellant say he was "fixin' to rob this Mexican."

Gama and Crabtree identified Myers as the man who held a pistol to Gama's back and took his wallet, leaned into the car, and demanded the women's purses. Gama and Crabtree identified appellant as one of the men who surrounded Pena, but they could not remember where he was standing. They testified one of the suspects standing around Pena pulled another gun on Pena and demanded his money, and that person was not Myers. Pena fought back and he was fatally shot.

Both Canady and Andrew saw a gun in appellant's pants before the robbery and shooting. Andrew testified he saw appellant holding a gun immediately after he heard the single gunshot. Packard, appellant's girlfriend, testified appellant and his friends ran to her apartment after the shot was fired. When Packard and appellant were alone in her bedroom, appellant said "he shot the dude" and it was "[o]ver a fight."

We conclude substantial evidence supports the trial court's finding that appellant was guilty of murder as the actual killer and the court properly denied his petition for resentencing under section 1172.6. We therefore need not consider the court's alternate finding that he was guilty of murder as a major participant in the underlying robbery who acted with reckless indifference to human life. (See, e.g., *Davis*, *supra*, 107 Cal.App.5th at p. 512.)

After an independent review of the record, we find that no reasonably arguable factual or legal issues exist.

**DISPOSITION**

The judgment is affirmed.

15.